**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND, LONDON, AND LEXINGTON DIVISIONS**

| | |
|---|---|
| IN RE: | **CHAPTER 7** |
| **LICKING RIVER MINING, LLC**, *et al.* | **CASE NO. 14-10201** |
| **DEBTORS** | **JOINTLY ADMINISTERED** |

_____

| | |
|---|---|
| **PHAEDRA SPRADLIN, CHAPTER 7** | **PLAINTIFF** |
| **TRUSTEE OF THE DEBTORS' ESTATES,** | |
| **v.** | **ADV. PROC. NO. 15-1004** |
| **EAST COAST MINER, LLC**, *et al.* | **DEFENDANTS** |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on Motions for Summary Judgment filed by Plaintiff

Phaedra Spradlin, Chapter 7 Trustee of the Debtors' Estates ("Trustee") [ECF No.

199 ("Trustee's Motion")],[1] and Defendants East Coast Miner, LLC ("ECM") [ECF No.

189 ("ECM's Motion")], East Coast Miner II, LLC ("ECM II') [ECF No. 190 ("ECM II's

Motion")], Keith Goggin [ECF No. 191 ("Goggin's Motion")] and Michael Goodwin [ECF No.

192 ("Goodwin's Motion")].[2]  The Motions were fully briefed and supported by voluminous

exhibits.  The Court heard oral argument on October 18 and November 8, 2018, and thereafter

ordered supplemental briefing.  This Memorandum Opinion and Order pertains to the Motions

---

[1] "Debtors" are U.S. Coal Corporation ("U.S. Coal"), Licking River Mining, LLC ("LR Mining"), Licking River Resources, Inc. ("LR Resources"), S.M.&J., Inc. ("SMJ"), Fox Knob Coal Co., Inc. ("Fox Knob"), J.A.D. Coal Company, Inc. ("JAD"), Harlan County Mining LLC ("Harlan"), Oak Hill Coal, Inc. ("Oak Hill"), Sandlick Coal Company ("Sandlick"), and US Coal Marketing LLC ("USC Marketing").

[2] ECM, ECM II, Goodwin, and Goggin are collectively referred to as "Defendants," and their motions for summary judgment are collectively referred to as "Defendants' Motions."  Trustee's Motion and Defendants' Motions collectively are referred to as the "Motions."

seeking summary judgment on Trustee's fraudulent transfer claims (Counts 5, 6, 8, 9, 10, 13, 14, 15, and 17), preferential transfer claim (Count 18), recharacterization claim (Count 12), and equitable subordination claims (Counts 11 and 16) in the First Amended Complaint [ECF No. 63 ("Amended Complaint")].[3]

## JURISDICTION

This Court has jurisdiction over this adversary proceeding.  28 U.S.C. § 1334(b).  Venue is proper in this District.  28 U.S.C. § 1409.

Bankruptcy courts may "hear and determine . . . all core proceedings arising under title 11 . . . and may enter appropriate orders and judgments, subject to review under section 158 of this title."  28 U.S.C. § 157(b)(1).  Examples of "core proceedings" are set out in 28 U.S.C. § 157(b)(2).  Bankruptcy courts also may hear non-core proceedings that are related to cases under title 11 but, absent party consent, they cannot finally resolve them and must submit proposed findings of facts and conclusions of law to the district court.  28 U.S.C. § 157(c)(1)-(2).  The parties agree that all claims addressed herein are core proceedings under 28 U.S.C. § 157(b).  The parties also have consented to this Court's entry of final orders on those claims.

## PERTINENT UNDISPUTED FACTS

The following discussion identifies undisputed facts that provide preliminary information to introduce the parties and some of the challenged transactions.  Most of the undisputed facts upon which the Court relies to resolve the Motions are set forth in the legal analyses below.

---

[3] The Court previously granted Defendants' motions to dismiss Counts 1-4 with prejudice.  [ECF No. 128].  Regarding summary judgment, the Court previously: (a) entered an Agreed Order [ECF No. 269] resolving portions of the Motions as to Counts 10, 12, 13, 19, and 20; and (b) entered a Memorandum Opinion and Order on the Motions as to Count 7 [ECF No. 270].  With the entry of this Memorandum Opinion and Order, the Court will have ruled on all portions of the parties' Motions.

1.     **General Background.**

U.S. Coal, a Delaware corporation, was formed on June 23, 2006.  Goggin and Goodwin were both directors of U.S. Coal.  Their terms on U.S. Coal's Board of Directors ("Board") began on or about October 1, 2009.  Goodwin's term ended on October 23, 2012, and Goggin's term ended on February 3, 2014.

Shortly after its formation, U.S. Coal acquired a mining operation referred to as the "Licking River Division" from John Whitt, Kenneth Whitt, John Collins ("Collins"), and their families (collectively, "LR Sellers").  Located in Magoffin County, Kentucky, the Licking River Division is comprised of LR Mining, LR Resources, SMJ, and Oak Hill (collectively, "LR Debtors").  U.S. Coal financed the acquisition in part by issuing promissory notes totaling $10 million to the LR Sellers.

In early June 2007, two investment funds, CAMOFI Master LDC and CAMHZN Master LDC (together, the "CAM Entities"), purchased about $4.5 million of U.S. Coal's preferred stock and warrants to purchase common stock.  Shortly thereafter, via a preliminary agreement dated June 19, 2007, U.S. Coal contracted to purchase another group of companies referred to as the "JAD Division" and owned by the Dean and McAfee families (together, the "JAD Sellers"). The JAD Division includes JAD, Harlan, Fox Knob, and Sandlick (collectively, "JAD Debtors"). As of April 15, 2008, U.S. Coal acquired the stock of the JAD Debtors.  JAD issued convertible notes to the JAD Sellers totaling $7 million ("JAD Seller Notes"), with $6 million secured by a lien on the JAD Debtors' assets.

In connection with the JAD Division acquisition, the CAM Entities made two loans.  The first was a $4.8 million loan for equipment purchased from the CAM Entities by U.S. Coal and JAD Debtors, in return for which CAMOFI Master LDC received a convertible promissory note

3

issued by JAD ("CAM Equipment Note").  The second was a $5 million bridge loan comprised

of several notes issued by JAD, Fox Knob, and Sandlick to Lawrence Kaplan, Michael Miller,

Futurtec, L.P., and the CAM Entities, all dated April 15, 2008 ("CAM JAD Bridge Notes").

U.S. Coal guaranteed the CAM JAD Bridge Notes.  U.S. Coal also entered into a related Rights

Agreement with Lawrence Kaplan, Michael Miller, Futurtec, L.P. and the CAM Entities, under

which those parties could exercise a "put option" to require U.S. Coal to purchase their shares of

U.S. Coal common stock.

**2.      Goodwin and Goggin Make Investments and Loans.**

Goggin and Goodwin became equity investors in U.S. Coal in 2008 by purchasing

common and preferred stock.  In December 2008 and January 2009, U.S. Coal borrowed $4.5

million from various parties, including Goodwin, Goggin, and CAMOFI Master LDC, and issued

unsecured promissory notes totaling $4.5 million (collectively, the "2008 Bridge Notes").  The

2008 Bridge Notes included one $1 million unsecured note and one $450,000 unsecured note to

each of Goodwin and Goggin.  Only LR Resources, SMJ, and Oak Hill guaranteed the 2008

Bridge Notes.

**3.      ECM is Formed and Acquires U.S. Coal Debt.**

In March 2008, JMB Capital Partners Master Fund ("JMB") acquired significant

outstanding debt that U.S. Coal owed to another lender.  In August 2008, U.S. Coal and JMB

entered into a Second Amended and Restated Credit Agreement ("JMB Credit Agreement") and

a separate Value Right Agreement effective as of April 15, 2008.  U.S. Coal's obligations to

JMB under those agreements matured on September 30, 2009 and March 31, 2010, respectively.

From late 2008 into the third quarter of 2009, U.S. Coal sought replacement financing for the

JMB Credit and Value Right Agreements.

Goggin and Goodwin had interest in acquiring JMB's positions. They negotiated concurrently with JMB to acquire its positions and with U.S. Coal to enter into a new credit agreement. On September 11, 2009, Goggin sent an email to U.S. Coal's CEO Robert Gabbard ("Gabbard") and CFO James "Jim" Wolff ("Wolff"), and others, with the outline of a proposed transaction:

> The JMB Notes and Value Right would be acquired by a third party in a transaction similar to the one currently proposed by [another potential lender]. The terms of the combined securities would be modified to suit the new owners. Face value on the amended note and value right would be the outstanding balance as of September 30, 2009. The model from last week listed this as $24.01 million. …

[ECF No. 204-4 at 2.] The "third party" was to be ECM, formed under Delaware law on September 28, 2009. Effective September 30, 2009, ECM paid $18 million to acquire JMB's interests under both the JMB Credit and Value Right Agreements. As part of that transaction, ECM, U.S. Coal, LR Resources, Oak Hill, SMJ, JAD, Fox Knob, and Sandlick entered into the First Amendment to Second Amended and Restated Credit Agreement and Value Right Agreement ("ECM Credit Agreement"), which refinanced the amounts previously owed to JMB and terminated the Value Right Agreement. Also during September 2009, Goodwin and Goggin's respective 2008 Bridge Notes were amended and restated, including an extension of their maturity dates.

Goggin was ECM's sole manager at all relevant times. Goggin and Goodwin were among the direct investors in and members of ECM. U.S. Coal Director Dennis Koutsodimitropoulos ("Koutsodimitropoulos") was the designated representative of an entity that directly invested in ECM. In addition, several members of Debtors' management (including directors Collins, Gabbard, and John Whitt) invested in ECM indirectly via ownership interests in a separate entity, U.S. Coal Management, LLC ("USCM"), which was organized in Kentucky

on September 29, 2009.  On September 30, 2009, U.S. Coal transferred $800,000 to USCM—

$100,000 for each of eight members of Debtors' management and/or Board (Gabbard, Wolff,

Collins, Jeff Dean, Julia McAfee, Malcolm Thomas, John Whitt, Kenneth Whitt).  All but

McAfee and Dean also invested an additional $100,000 of their own funds into USCM, for a

total of $600,000 from those individuals and $800,000 from U.S. Coal (combined $1.4 million).

In turn, USCM invested $1.4 million into ECM.

At the time of the ECM transaction, the U.S. Coal Board had four directors:  John Whitt,

Karl Douglas, Gabbard, and Koutsodimitropoulos.  During its October 1, 2009 meeting, the

Board approved Douglas' resignation, leaving Gabbard, Whitt, and Koutsodimitropoulos as

directors.  During that same meeting, the Board approved the ECM transaction and ratified all

actions taken by the directors, officers, and representatives of U.S. Coal regarding the ECM

transaction.  The Board also approved an expansion from four to five members and the addition

of Goggin and Goodwin to the Board "effective upon the closing of the proposed transaction

with ECM . . . as the designees of ECM . . . ."  [ECF No. 197-17 at 6.]  At the next Board

Meeting on October 13, 2009, Goggin moved to ratify and approve the $800,000 transfer from

U.S. Coal to USCM, which was seconded and unanimously approved.

**4.      ECM II is Formed and Provides Financing.**

Throughout 2010 and 2011, Debtors searched for financing to consolidate all of U.S.

Coal's debt into a single senior secured loan.  After a proposal from Macquarie Bank Limited

("Macquarie") did not result in an agreement, Debtors continued to search for other financing.

Michael Windisch ("Windisch") replaced Wolff as U.S. Coal's Chief Financial Officer in

September 2011.  Goggin organized ECM II under Delaware law on October 25, 2011.  Goggin

and Goodwin were the only U.S. Coal insiders to invest in ECM II.

U.S. Coal negotiated with ECM II (through Goggin) for a loan to pay off the CAM JAD Bridge Notes. Initially, ECM II proposed a 20% interest rate for the loan. U.S. Coal (through Windisch) requested that ECM II accept an 18% rate and later suggested a 15% rate. ECM II agreed to lower the interest rate to 18% only, with a 5% default interest provision.

The Board voted to approve the ECM II transaction on November 23, 2011. Goggin and Goodwin abstained from voting. Collins, Koutsodimitropoulos, and John Whitt approved the transaction. The Credit Agreement among ECM and all Debtors was executed as of December 7, 2011 ("ECM II Credit Agreement"), and the transaction closed on that date.

Pursuant to the ECM II Credit Agreement, ECM II loaned a total of $6,729,422.60 ("ECM II Loan") through two term loans. ECM II loaned $1,322,406.38 to U.S. Coal to pay the 2008 Bridge Notes, except for those held by Goggin and Goodwin. ECM II loaned $5,407,016.22 to JAD, Fox Knob, and Sandlick to pay the CAM JAD Bridge Notes. The ECM II Credit Agreement obligates all Debtors to pay the entire ECM II Loan amount: U.S. Coal, JAD, Fox Knob, Sandlick as borrowers, and the other six Debtors as guarantors.

As part of the ECM II transaction, Goodwin and Goggin's 2008 Bridge Notes were amended and restated a second time, including an extension of their maturity dates.

**5.     Goodwin and Goggin's Personal Notes are Restructured into the 2013 Amended Notes.**

U.S. Coal defaulted on Goodwin and Goggin's 2008 Bridge Notes (as amended and restated) on February 1, 2012. On October 22, 2012, while still a member of the Board, Goodwin served U.S. Coal with written notices of default on his two personal notes. The next day, Goodwin resigned from the Board, leaving the Board with four members (Goggin,

Koutsodimitropoulos, Collins, John Whitt).[4]  Thereafter, Goodwin started negotiations with U.S. Coal (through Collins and Windisch) regarding the defaults.

Goggin did not resign from the Board when Goodwin did.  In advance of negotiations between U.S. Coal and Goodwin, Goggin advised Collins and Windisch that he would accept any terms they negotiated with Goodwin for the satisfaction of Goodwin's 2008 Bridge Notes. Goggin communicated with U.S. Coal's representatives about these negotiations while they were ongoing.

Effective February 1, 2013, Goodwin and Goggin's unsecured 2008 Bridge Notes were again amended and restated into secured notes (the "2013 Amended Notes"), each with a balance of $1,097,620.03, due on October 31, 2014.  U.S. Coal was again the obligor.  LR Resources, SMJ, and Oak Hill again guaranteed, and for the first time, they were joined by co-guarantors JAD, Fox Knob, Sandlick, LR Mining, Harlan, and USC Marketing, rendering all ten Debtors obligated on the 2013 Amended Notes.  All ten Debtors also pledged all-asset liens to secure the 2013 Amended Notes, converting the underlying debt—which had been unsecured from its 2008 inception—to secured debt.

The Board held a vote to approve the 2013 Amended Notes transaction during a special meeting on February 11, 2013.  Goggin, Collins, Koutsodimitropoulos, and John Whitt were the four Board members at that time.  Goggin abstained from voting, Whitt and Collins voted to approve the transaction, and Koutsodimitropoulos did not vote.  The next day, on February 12, 2013, Goodwin and Goggin each received a $175,000 wire transfer pursuant to the 2013 Amended Notes.

---

[4] Goodwin tendered evidence that he verbally resigned during a call on October 19, 2012, prior to giving written notice.  Whether Goodwin resigned on October 19 or 23 is not a material issue of fact with respect to the resolution of Goodwin's Motion as to the Counts addressed in this Opinion.

6.        **Debtors' Bankruptcies Commence.**

U.S. Coal lost its long-standing line of credit with Commercial Bank on or about

February 25, 2014, which required U.S. Coal to repay millions of dollars to Commercial Bank

from its cash reserves.  U.S. Coal also stopped paying most of its trade obligations, which

ballooned in 2014.  On May 22, 2014, certain of LR Mining's creditors filed an involuntary

chapter 11 petition against it.  Involuntary petitions against LR Resources, Fox Knob, SMJ, and

JAD followed shortly thereafter.  On June 10, 2014, an involuntary petition was filed against

U.S. Coal.  The remaining four Debtors filed voluntary chapter 11 petitions on November 4,

2014.  Collectively, all of the involuntary and voluntary petition dates are hereinafter referred to

as the "Petition Dates."

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when the evidence, construed in the light most

favorable to the non-movant, confirms that there is no genuine issue of material fact and the

movant is entitled to a judgment as a matter of law.  FED. R. CIV. P. 56(c) (made applicable to

adversary proceedings by FED. R. BANKR. P. 7056); *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986).  A genuine issue of material fact is present when there are

"disputes over facts that might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When evaluating the evidence

presented on a motion for summary judgment, "the judge's function is not [herself] to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial."  *Id*. at 249.

> The burden of production imposed by Rule 56 requires the moving party to make
> a prima facie showing that it is entitled to summary judgment.  The manner in
> which this showing can be made depends upon which party will bear the burden
> of persuasion on the challenged claim at trial.  If the *moving* party will bear the

burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial. Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery.

If the burden of persuasion at trial would be on the *nonmoving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (citations omitted) (emphasis in original).

If the movant satisfies its burden of production, the non-movant "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Ellington v. City of E. Cleveland,* 689 F.3d 549, 552 (6th Cir. 2012) (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009)). Unless the non-movant submits evidence that would permit a reasonable fact-finder to return a verdict in the non-movant's favor, the court must grant a summary judgment. *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 149 (6th Cir. 1995); *see also Snyder v. Ohio Dep't of Rehab. & Corr.*, 702 F. App'x 341, 343 (6th Cir. 2017) (the non-movant "must present significant and probative evidence to support his claim") (citing *Anderson*, 477 U.S. at 249)). A mere existence of a scintilla of evidence favoring the non-movant cannot defeat a properly-supported motion for summary judgment, but a court will deny a motion if evidence is presented from which a fact-finder reasonably could return a verdict for the non-movant. *Anderson* at 252.

Here, the parties filed cross-motions for summary judgment regarding certain counts of the Amended Complaint identified below. The standard does not differ when each side seeks to

resolve a claim on its own motion for summary judgment. *Taft Broadcasting Co. v. U.S.*, 929

F.2d 240, 248 (6th Cir. 1991). "[T]he court must evaluate each party's motion on its own merits,

taking care in each instance to draw all reasonable inferences against the party whose motion is

under consideration." *Id*. at 248 (quoting *Mingus Constructors, Inc. v. U.S.*, 812 F.2d 1387,

1391 (Fed. Cir. 1987)).

## ANALYSIS

### I.    Trustee's Count 12 claim to recharacterize ECM's and ECM II's debt as equity cannot proceed to trial.

In Count 12, Trustee seeks to recharacterize the debt owed to ECM under the ECM

Credit Agreement and the debt owed to ECM II under the ECM II Credit Agreement as equity

investments. ECM and ECM II moved for a summary judgment on Count 12, while Trustee

seeks a summary judgment in her favor against ECM only. In another adversary proceeding

related to Debtors' bankruptcy cases, this Court detailed the legal basis for a recharacterization

claim as follows:

> Under § 105, bankruptcy courts may recharacterize debt as equity in the Sixth
> Circuit "where the circumstances show that a debt transaction was 'actually [an]
> equity contribution [ ] *ab initio*.'" [*Bayer Corp. v. MascoTech, Inc., (In re
> AutoStyle Plastics, Inc.)*, 269 F.3d 726, 748 (6th Cir. 2001)] (quoting *In re Cold
> Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997). "In a
> recharacterization analysis, if the court determines that the advance of money is
> equity and not debt, the claim is recharacterized and the effect is subordination of
> the claim 'as a proprietary interest because the corporation repays capital
> contributions only after satisfying all other obligations of the corporation.'" *Id*. at
> 749 (citation omitted). The Sixth Circuit instructs that courts should apply an
> eleven-factor test, with no factor being controlling, to assess whether
> recharacterization is warranted:
>
>> The factors are: (1) the names given to the instruments, if any, evidencing
>> the indebtedness; (2) the presence or absence of a fixed maturity date and
>> schedule of payments; (3) the presence or absence of a fixed rate of
>> interest and interest payments; (4) the source of repayments; (5) the
>> adequacy or inadequacy of capitalization; (6) the identity of interest
>> between the creditor and the stockholder; (7) the security, if any, for the
>> advances; (8) the corporation's ability to obtain financing from outside

> lending institutions; (9) the extent to which the advances were
> subordinated to the claims of outside creditors; (10) the extent to which
> the advances were used to acquire capital assets; and (11) the presence or
> absence of a sinking fund to provide repayment.
>
> *Id.* at 749-50 (citing *Roth Steel Tube Co. v. Comm'r of Internal Rev.*, 800 F.2d
> 625, 630 (6th Cir. 1986)).
>
> "'[T]he more [a transaction] appears to reflect the characteristics of . . . an arm's
> length negotiation, the more likely such a transaction is to be treated as debt.'" *Id.*
> at 750 (citing *Cold Harbor*, 204 B.R. at 915). "[T]he paradigmatic situation for
> recharacterization [is] where the same individuals or entities (or affiliates of such)
> control both the transferor and the transferee, and inferences can be drawn that
> funds were put into an enterprise with little or no expectation that they would be
> paid back along with other creditor claims." *In re Adelphia Communs. Corp.*, 365
> B.R. 24, 74 (Bankr. S.D.N.Y. 2016).

*Spradlin v. Whitt (In re Licking River Mining, LLC)*, 572 B.R. 812, 824 (Bankr. E.D. Ky. 2017).

As an initial matter, with respect to the "*AutoStyle* factors" identified above, Trustee

contends that these factors "*may* be considered by a court in determining the true nature of a

transaction." [ECF No. 200 at 95 (emphasis added).]  Trustee avers that the Court need not use

the *AutoStyle* factors to resolve her recharacterization claims against ECM and ECM II because

the Court can discern that their debts should be recharacterized without them.  [*Id.* at 102 ("Here,

because the fact that the Value Right Payable was equity is so clear, there is no need to consult

the *AutoStyle* factors."); ECF No. 231 at 186 ("[R]esorting to counting *AutoStyle* factors is not

necessary to recharacterize [ECM II's] claim as equity.").]  But Trustee offers no authority to

support her argument that a bankruptcy court in the Sixth Circuit has discretion over whether to

apply the *AutoStyle* factors to resolve a recharacterization claim.  Accordingly, the Court will use

the *AutoStyle* factors to evaluate the pending motions.

In applying the *AutoStyle* factors, courts perform "a highly fact-dependent inquiry that

will vary in application from case to case." *Fairchild Dornier GMBH v. Official Comm. of*

*Unsec'd Creditors (In re Official Comm. of Unsec'd Creditors for Dornier Aviation)*, 453 F.3d

12

225, 234 (4th Cir. 2006).  Moreover, whether recharacterization is appropriate does not depend on how many of the eleven factors are met.  As the Third Circuit has stated: "[n]o mechanistic scorecard suffices.  And none should, for Kabuki outcomes elude difficult fact patterns." *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Systems Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006).  Ultimately, "[t]o determine whether an advance to a company is debt or equity, courts consider 'whether the objective facts establish an intention to create an unconditional obligation to repay the advances.'  In doing so, courts look not only to the form of the transaction, but, more importantly, to its economic substance." *Indmar Prod. Co. v. C.I.R.*, 444 F.3d 771, 776 (6th Cir. 2006) (citations omitted).

"Whether advances are capital contributions or loans is a question of fact." *Devon Mobile Commc'ns Liquidating Tr. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, No. 02-41729, 2006 WL 687153, at *10 (Bankr. S.D.N.Y. Mar. 6, 2006) (citing *SubMicron*, 432 F.3d 448).  Where there is no dispute regarding a material fact, and a party is entitled to a judgment as a matter of law, a summary judgment may be granted on a recharacterization claim.  *See*, *e.g.*, *AutoStyle*, 269 F.3d at 747-753 (affirming summary judgment dismissing recharacterization claim).

### A.     ECM is entitled to a summary judgment on Trustee's recharacterization claim against ECM.

Trustee's recharacterization claim against ECM derives from the contention that a significant component of the amount that U.S. Coal agreed to repay under the ECM Credit Agreement ($9.4 million out of $24 million) stemmed from the Value Right Agreement ("VRA") between U.S. Coal and JMB, and not from the JMB Credit Agreement.  JMB assigned both of these agreements to ECM, and the sums due under each were combined in the ECM Credit

Agreement.  The ECM Credit Agreement refers to this $9.4 million as the "Value Right Payable," a defined term that was not in the VRA itself.

Trustee posits that the VRA was designed to grant JMB a disguised equity stake in U.S. Coal.  She avers that JMB's assignment of the VRA to ECM did not change the character of that obligation when the $9.4 million owed to JMB under that agreement was rolled into the ECM Credit Agreement.  In other words, because the Value Right Payable was not really a loan to be repaid when the transaction with JMB occurred, it was not debt when it was combined with the loan amount due under the JMB Credit Agreement in the ECM Credit Agreement.  Trustee also argues that U.S. Coal's negotiators were not operating at arm's length when they negotiated the ECM Credit Agreement because they were indirect investors in ECM.  In sum, Trustee contends that facts surrounding the creation of the VRA, and the incorporation of the Value Right Payable into the total amount due under the ECM Credit Agreement, warrant a finding that the $9.4 million was an equity contribution, such that the entire remaining debt obligation owed under the ECM Credit Agreement (and sought via ECM's proof of claim) can be recharacterized.  Only after Trustee lays out this reasoning does she offer any analysis of the *AutoStyle* factors. Accordingly, Trustee's argument derives almost entirely from the VRA's characteristics and not the ECM Credit Agreement's terms. The Court finds Trustee's position unavailing.

### 1.    The Names Given to the Instruments.

Trustee does not raise an argument about the name of the instruments at issue, *i.e.*, the ECM Credit Agreement and the related and contemporaneously-executed documents.  Instead, Trustee contends that "[t]here is no such thing as a Value Right Payable," a defined term in the ECM Credit Agreement.  [ECF No. 231 at 182; ECF No. 200 at 102.]  This argument lacks merit.  ECM correctly notes (and Trustee does not actually dispute) that "[a]ll of the documents associated with the ECM Credit Facility are debt instruments and utilize terminology consistent

14

with debt instruments." [ECF No. 189-1 at 20; *see also* ECF Nos. 197-5, 197-6, 197-7, 197-8, 197-9.]  While the ECM Credit Agreement defines and then references the Value Right Payable, whether a loan document contains a term unique to the transaction is not the inquiry.[5]  There can be no material dispute that the parties to the ECM Credit Agreement used standard instruments of indebtedness.

**2.      The Presence or Absence of a Fixed Maturity Date and Schedule of Payments.**

The ECM Credit Agreement amended portions of the JMB Credit Agreement and incorporated its other terms.  As amended, the loan had a fixed maturity date of December 31, 2011, and U.S. Coal was required to make minimum monthly payments on the first business day of each month.  Trustee offers no argument regarding this factor.

**3.      The Presence or Absence of a Fixed Rate of Interest and Interest Payments.**

The ECM Credit Agreement contains an interest rate of 12% and a default interest rate of 5%.  As already noted, the ECM Credit Agreement incorporated other terms of the JMB Credit Agreement, including the requirement that monthly interest payments be made.  Trustee also offers no argument on this factor.

**4.      The Source of Repayments.**

"If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution."  *AutoStyle*, 269 F.3d at 751.  The ECM Credit Agreement does not specify a source of repayments, nor does it require

---

[5] In the same paragraph, the ECM Credit Agreement defines the "Value Right Payable" and the "Credit Agreement Payable" as the amounts due under the VRA and the JMB Credit Agreement, respectively, as of September 30, 2009.  [ECF No. 197-7 at ¶ 18.]  The amounts designated as the Value Right Payable and the Credit Agreement Payable then were defined together to constitute the "Loan" made by ECM (as the previously defined "Lender") to U.S. Coal (as the previously defined "Borrower").  [*Id.*]  The parties defined dozens of terms in the ECM Credit Agreement.  As a result, Trustee's contentions about the defined term "Value Right Payable," without acknowledgement of that fact and without offering further context from the ECM Credit Agreement, are misleading.

repayment only if U.S. Coal's business can make payments. Rather, it requires monthly

principal and interest payments and contains a default interest provision. Trustee does not

address this factor.

### 5. The Identity of Interest Between the Creditor and Stockholder.

Trustee argues that there "is a plain identity of interest between ECM and U.S. Coal"

because "[e]very [U.S. Coal] Board member was directly or indirectly interested in ECM."

[ECF No. 200.] Trustee's contention does not address why this factor pertains to the

recharacterization inquiry:

> If stockholders make advances in proportion to their respective stock ownership,
> an equity contribution is indicated. On the other hand, a sharply disproportionate
> ratio between a stockholder's percentage interest in stock and debt is indicative of
> bona fide debt. "Where there is an exact correlation between the ownership
> interests of the equity holders and their proportionate share of the alleged loan . . .
> this evidence standing alone is almost . . . overwhelming."

*AutoStyle*, 269 F.3d at 751 (citations omitted). Trustee offers no evidence that ECM owned any

U.S. Coal stock as of the ECM Credit Agreement's execution, such that ECM's loan amount

correlated to its stock ownership.

In addition, several direct and indirect investors in ECM also were U.S. Coal

shareholders. Those shareholders invested in ECM, and the money they invested (along with

money from other sources) was used to fund ECM's purchase of U.S. Coal's debt from JMB.

Even assuming it is appropriate to ignore the distinction between ECM and its owners, however,

Trustee offers no evidence to show that the funds the U.S. Coal shareholders invested in ECM

were proportionate to their then-existing interests in U.S. Coal.

### 6. The Security for the Advances.

The next factor concerns the presence or absence of security for advances made under the

alleged debt. "The absence of a security for an advance is a strong indication that the advances

16

were capital contributions rather than loans." *AutoStyle*, 269 F.3d at 752.  Here, the parties

executed a security agreement contemporaneously with the ECM Credit Agreement, and the

ECM Credit Agreement also modified the JMB Credit Agreement regarding existing liens on

collateral.  Trustee does not address this factor.

> **7.**    **The Corporation's Ability to Obtain Financing from Outside Lending Institutions.**

"When there is no evidence of other outside financing, the fact that no reasonable creditor

would have acted in the same manner is strong evidence that the advances were capital

contributions rather than loans." *AutoStyle*, 269 F.3d at 752.  Trustee offers no evidence or

argument about whether U.S. Coal was able to obtain outside financing when it entered into the

ECM Credit Agreement (which replaced outside financing from JMB).  ECM, on the other hand,

supplied (i) a copy of an indicative financing proposal from White Oak Global Advisors, LLC to

U.S. Coal, (ii) correspondence from U.S. Coal's CFO on September 25, 2009, stating that White

Oak had tendered a financing proposal that was under consideration, and (iii) deposition

testimony from the CFO that White Oak's proposal was under consideration around the time of

the ECM Credit Agreement's execution.

> **8.**    **The Extent to Which Advances Were Subordinated to Claims of Outside Creditors.**

"Subordination of advances to claims of all other creditors indicates that the advances

were capital contributions and not loans." *AutoStyle*, 269 F.3d at 752 (citation omitted).  ECM

correctly notes that the ECM Credit Agreement does not provide for the subordination of the

ECM debt to any other debt.  Trustee also offers no argument or evidence on this factor.

> **9.**    **The Extent to Which Advances Were Used to Acquire Capital Assets.**

ECM acquired JMB's pre-existing debt, and ECM and U.S. Coal agreed to new financing

terms, via the ECM Credit Agreement and related documents.  No evidence in the record shows

that any ECM funds were advanced to help U.S. Coal or the other Debtors acquire capital assets. Trustee offers nothing to the contrary.

### 10.     The Presence or Absence of a Sinking Fund for Repayments.

"A sinking fund is '[a] fund consisting of regular deposits that are accumulated with interest to pay off a long-term corporate or public debt.'" *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 101 (Bankr. S.D.N.Y. 2016) (quoting BLACK'S LAW DICTIONARY (10th ed. 2014)). "The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." *AutoStyle*, 269 F.3d at 753.  Because ECM took security for the debt at issue, it contends that this factor is moot and Trustee appears to agree.  In *AutoStyle*, because "the loans were secured with liens, which obviated any need for a sinking fund," the Sixth Circuit concluded "that this factor only slightly weighs toward equity, if at all." *Id*. (quotation omitted).  Given the parties' positions and the circumstances presented, the Court finds that this factor does not play a role in this *AutoStyle* analysis.

### 11.     The Adequacy or Inadequacy of Capitalization.

Trustee contends that U.S. Coal was inadequately capitalized when the ECM Credit Agreement was executed.  ECM concedes that inadequate capitalization is an issue of fact that remains in dispute, with both parties offering expert opinions on this issue.  However, ECM also tendered persuasive authority supporting its argument that inadequacy of capitalization by itself cannot support a recharacterization claim.  [ECF No. 189-1 at 22-23 (citing, *inter alia*, *In re Va. Broadband, LLC*, 521 B.R. 539, 573 (Bankr. W.D. Va. 2014) ("[I]f courts recharacterized debt each time an insider made a loan to a struggling company, no insider (or perhaps any creditor) would lend financial assistance to a distressed company for fear of punitive action by a bankruptcy court.  For these reasons, the Court does not place substantial weight on the

deteriorating financial situation at the time the financial assistance was rendered."); *Stapleton v. NewKey Grp., LLC (In re SGK Ventures, LLC)*, Nos. 15 C 11224, 15 C 11226, 15 C 11253, 2017 WL 2683686, at *8 (N.D. Ill. June 20, 2017) ("To justify recharacterizing as equity what is apparently a loan, the Trustee needed to identify more than Keywell's financial distress and the insider status of the [lender entity's] members.  Since the Trustee failed to do so, the bankruptcy court's denial of her recharacterization claim is affirmed.").]  Trustee offers no authority supporting the view that the inadequacy of a debtor's capitalization at the time of a challenged loan transaction alone can warrant a finding that the loan was in fact an equity infusion.  This Court will not reach that conclusion on the facts presented.

### 12.    Conclusion.

Nine *AutoStyle* factors weigh decidedly against recharacterization, the sinking-fund factor is irrelevant here, and the only fact dispute, concerning the adequacy of U.S. Coal's capitalization when the ECM Credit Agreement was executed, is insufficient alone, as a matter of law, to raise an issue of fact as to the recharacterization claim.

"The determination of whether advances to a corporation are loans or capital contributions depends on whether the objective facts establish an intention to create an unconditional obligation to repay the advances."  *Roth Steel Tube Co. v. I.R.S.*, 800 F.2d 625, 630 (6th Cir. 1986) (viewing recharacterization in the context of the Internal Revenue Code). Overwhelming evidence establishes that ECM's claim is based upon an overall transaction that bears all the hallmarks of a loan with an unconditional obligation to repay, not an equity infusion.  Just like in *Adelphia*, this is not a situation where the same individuals or entities controlled both the transferor and the transferee, allowing an inference that ECM invested funds in U.S. Coal with little or no expectation that they would be repaid along with other creditor

claims. *Adelphia*, 365 B.R. at 74.  Trustee's arguments related to the VRA improperly focus on

a prior agreement between U.S. Coal and a different party.  Upon ECM's acquisition of the

amount owed under the VRA from JMB, ECM and U.S. Coal agreed to the loan arrangement

that led to the claim at issue.  That claim, derived from a different agreement with different terms

than the VRA, is analytically separate.  Trustee has offered neither legal authority nor any

relevant evidence to reach the opposite conclusion.

Trustee did not present sufficient evidence to withstand ECM's motion on Count 12.

Based on the evidence in the record, the Court concludes that no reasonable fact-finder could

determine that the ECM Credit Agreement, in reality, was an equity infusion by ECM into U.S.

Coal such that recharacterization is warranted.  *See Korn v. Paul Revere Life Ins. Co.*, 382 F.

App'x 443, 448 (6th Cir. 2010) (affirming summary judgment in matter where the disputed issue

"is often a question of fact not to be decided on summary disposition" but "no reasonable fact-

finder could determine that" a party could succeed on his claim.).  ECM's Motion on Count 12 is

GRANTED, and Trustee's Motion on this Count is DENIED.

**B.      ECM II is entitled to a summary judgment on Trustee's recharacterization claim.**

ECM II likewise is entitled to a judgment as a matter of law on Trustee's

recharacterization claim based on an application of the *AutoStyle* factors.  ECM II concedes that

the adequacy of capitalization factor is in dispute.  ECM II also avers that U.S. Coal could not

obtain alternate financing at the time the parties executed the ECM II Credit Agreement, and that

this *AutoStyle* factor therefore weighs in favor of a finding of equity.[6]  Like ECM, ECM II posits

that the "sinking fund" factor is inapplicable here because ECM II took security for the advance

---

[6] Weeks before U.S. Coal consummated the ECM II Loan transaction, it had received a proposal from Macquarie to
refinance virtually all of its debt ($95 million) at an 8% interest rate, which calls this concession into question.

at issue.  ECM II contends that the remaining factors weigh so heavily in favor of a finding of

debt that it should prevail on summary judgment.

In contrast, Trustee offers several arguments about matters unrelated to the *AutoStyle*

factors, such as her position that ECM II charged excessive interest and that a majority of the

U.S. Coal Board did not approve the ECM II transaction.  The entirety of Trustee's argument

under the *AutoStyle* factors as applied to ECM II's claim is:  "just as with ECM, Factor 5

(identity of interest) and Factor 6 (inadequate capitalization) support recharacterization here."

[ECF No. 231 at 186.]  Because, as explained above, the Court must apply the *AutoStyle* factors

to evaluate Trustee's recharacterization claim against ECM II, Trustee's arguments unrelated to

those factors do not warrant further discussion.

The Court finds that Trustee has failed to identify any evidence from which it could be

found that the ECM II Loan transaction constituted an equity infusion.  The transaction involved

the execution of typical documents for a commercial loan.  ECM II received promissory notes,

the parties agreed to a repayment schedule for principal and interest payments, and the parties

signed an agreement granting security for the ECM II Loan.  The funds ECM II advanced were

used to retire other debt, not to acquire capital assets.  While Goodwin and Goggin were among

the investors in ECM II, their involvement does not create an identity of interest between ECM II

and U.S. Coal in the manner envisioned by *AutoStyle*.  The ECM II Credit Agreement and other

documents do not provide for the subordination of the ECM II Loan debt to any other party.

Because ECM II took security from nearly all Debtors, whether a sinking fund existed is not an

issue.  Finally, as explained above, a dispute regarding the adequacy of capitalization alone does

not justify a different conclusion or a denial of ECM II's Motion given the evidence bearing on

the other *AutoStyle* factors.

For these reasons, the Court concludes that there is no material dispute of fact that prevents the Court from resolving Count 12 in ECM II's favor, and that no reasonable fact-finder would find in Trustee's favor based on the evidence presented.  ECM II's Motion on Count 12 is GRANTED.

## II.    Trustee's claims for equitable subordination against all Defendants in Count 11 and against Goggin and Goodwin in Count 16 will proceed to trial in part as to certain Defendants.

In Count 11 of her Amended Complaint, Trustee asks the Court to equitably subordinate all Defendants' claims to those of other creditors "because of Defendants' inequitable conduct throughout their history of dealing with the Debtors."  [ECF No. 63 ¶ 1(b).]  Paragraph 224 outlines specific conduct that Trustee asserts as the factual predicate for her claim.  In Count 16, Trustee asks the Court to equitably subordinate Goodwin and Goggin's claims only based upon the 2013 transaction resulting in the 2013 Amended Notes, asserting that this transaction resulted from Goodwin and Goggin's inequitable conduct.  Defendants all moved for a summary judgment on Count 11, and Goodwin and Goggin moved for a summary judgment on Count 16.

"[T]he court may—under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."  11 U.S.C. § 510(c)(1).  The Sixth Circuit

> has adopted a three-part standard for establishing equitable subordination: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*AutoStyle*, 269 F.3d at 744 (citations omitted).  The existence of a valid debt is a prerequisite for this kind of claim.  *Id.* at 745.

"'[E]quitable subordination is an unusual remedy which should be applied in limited circumstances.'" *Id.* at 745 (quoting *Fabricators*, 926 F.2d 1458, 1464 (5th Cir. 1991)). Its purpose "'is to distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct such as fraud, misrepresentation, or the exercise of such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender.'" *Sloan v. Zions First Nat'l Bank, N.A. (In re Castletons, Inc.)*, 990 F.2d 551, 559 (10th Cir. 1993) (citation omitted).

Equitable subordination "is remedial, not penal, in nature and should be applied only to the extent necessary to offset the specific harm that the creditors suffered on account of the inequitable conduct." *In re Phase I Molecular Toxicology, Inc.*, 287 B.R. 571, 581 (Bankr. D.N.M. 2002) (citations omitted); *see also AutoStyle*, 269 F.3d at 749 ("the court is reviewing whether a legitimate creditor engaged in inequitable conduct, in which case the remedy is subordination of the creditor's claim 'to that of another creditor only to the extent necessary to offset injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective.'" (citation omitted)). On the other hand, the Third Circuit has explained that "quantification [of harm] may not always be feasible and, where that is the case, it should not redound to the benefit of the wrongdoer." *Citicorp Venture Cap., Ltd. v. Comm. of Creditors Hldg. Unsec'd Claims*, 160 F.3d 982, 991 (3d Cir. 1998). In that instance, "[a] bankruptcy court should . . . attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination." *Id.*

The equitable subordination claimant "bears the initial burden of showing that grounds exist for equitable subordination of a creditor's claim." *Phase I*, 287 B.R. at 578-79.

"Satisfaction of this three-part standard does not mean that a Court is *required* to equitably subordinate a claim, but rather that the Court is *permitted* to take such action." *AutoStyle*, 269 F.3d at 744 (emphasis in original).

Whether the party whose claim is to be subordinated is an insider affects the applicable standard of proof. *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs.)*, 974 F.2d 712, 717-18 (6th Cir. 1992).

> The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of the misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors. Where the claimant is a non-insider, egregious conduct must be proven with particularity. It is insufficient for the objectant in such cases merely to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others. Where the claimant is an insider, his dealings with the debtor will be subjected to more exacting scrutiny.

*Id*. at 718; *see also AutoStyle*, 269 F.3d at 744-45 ("'[a] claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts'" and "'if the claimant is an insider, less egregious conduct may support equitable subordination.'" (citations omitted)). A non-insider creditor's claim may be equitably subordinated, but the circumstances are "few and far between." *In re Granite Partners, L.P.*, 210 B.R. 508, 515 (Bankr. S.D.N.Y. 1997).

In addition to the definition of an insider in § 101(31)(B), in the Sixth Circuit, a non-statutory insider may be considered an "insider" for purposes of an equitable subordination analysis. *AutoStyle*, 369 F.3d at 745. "[A] non-statutory insider will have a sufficiently close relationship with a debtor, which may be based on control or influence over the debtor, such that dealings between that insider and the debtor are not at arm's length." *Spradlin v. Monday Coal, LLC (In re Licking River Mining, LLC)*, 571 B.R. 241, 253 (Bankr. E.D. Ky. 2017).

24

**A.    Trustee's equitable subordination claim in Count 11 will continue to trial against ECM.**

The Court concludes that sufficient evidence of a factual dispute exists to preclude a summary judgment in ECM's favor on Count 11.  Specifically, a material dispute of fact exists about whether Goggin used ECM's position as a significant secured creditor of U.S. Coal and his own position as ECM's manager to dominate the U.S. Coal Board and unfairly benefit ECM. The unfair benefits at issue include whether a Goggin-dominated Board (1) caused U.S. Coal to make consistent debt payments to ECM when other lenders were not being paid, and (2) led U.S. Coal to not enter into the Macquarie deal, which would have retired ECM's higher-interest debt. These matters implicate ECM's non-statutory insider relationship with U.S. Coal; all of U.S. Coal's directors in the pertinent time period directly or indirectly invested in ECM except for Koutsodimitropoulos, who represented an entity that had substantial investments in both U.S. Coal and ECM.

Trustee's several remaining contentions for why ECM's claim should be equitably subordinated lack merit because they do not involve conduct by or on behalf of ECM (i.e., USCM funding, ECM II Credit Agreement, refinance of Goodwin/Goggin personal notes), or do not constitute inequitable conduct (i.e., U.S. Coal's payment of ECM's legal fees, ECM's refusal to enter into a second subordination agreement).  Finally, Trustee argues that Goodwin sent an email to Goggin in September 2010 about "pushing" U.S. Coal into bankruptcy "in the most productive way possible for ECM."  [ECF No. 235-16.]  This email ultimately may constitute relevant evidence of some fact bearing on an issue to be tried.  But, in and of itself, this email communication does not evidence inequitable conduct.  Trade creditors filed involuntary petitions against related Debtors beginning in May 2014, nearly four years after Goodwin sent this message.

To succeed on her equitable subordination claim, in addition to proving that ECM committed inequitable conduct, Trustee must show that this misconduct injured creditors or unfairly advantaged ECM, and that equitable subordination of ECM's claim would be consistent with the Code. The Court concludes that Trustee has established that a genuine dispute of material fact exists as to these two elements related to the theories on this claim against ECM that may continue to trial. Subject to the limitations set forth above, ECM's Motion is DENIED as to Count 11.

**B.      ECM II is entitled to a summary judgment on Trustee's equitable subordination claim in Count 11.**

To evaluate Trustee's equitable subordination claim against ECM II, the Court first must consider whether ECM II is an insider. Unfortunately, the parties' analyses are lacking. Assuming without deciding that ECM II is a non-statutory insider of U.S. Coal for purposes of Count 11, the Court finds that ECM II's claim may not be equitably subordinated even under the stricter insider standard.

Trustee failed to marshal sufficient facts to make a *prima facie* showing that ECM II engaged in some type of inequitable conduct. In her response to Defendants' Motions, Trustee offers nine factual bases for why Defendants, collectively, are not entitled to a summary judgment on her equitable subordination claim. Only one of those bases even arguably relates to ECM II, and it concerns U.S. Coal's entry into the ECM II Credit Agreement and related transaction, including the rate of interest that ECM II charged for its loan. Trustee offers no authority to support the proposition that the terms of the ECM II Loan, in and of themselves, can permit this Court to equitably subordinate ECM II's claim arising from non-payment of that loan.

As another basis to equitably subordinate ECM II's claim, Trustee avers that Goggin's conduct is imputed to ECM II. [ECF No. 231 at 120 (citing *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 302–03 (Del. Ch.), *aff'd*, 126 A.3d 1115 (Del. 2015).] It appears that, by citing *Stewart*, Trustee would have the Court impose liability on ECM II for Goggin's conduct that had nothing to do with ECM II. But the Chancery Division's opinion in *Stewart* does not support this result. The opinion states that "the knowledge and actions of the corporation's officers and directors, *acting within the scope of their authority*, are imputed to the corporation itself." *Stewart*, 112 A.3d at 302-303 (emphasis added). Trustee identifies no specific conduct by Goggin in the scope of his authority as ECM II's principal that would make ECM II open to equitable subordination based on Goggin's inequitable conduct. This argument fails.

Next, to justify equitably subordinating ECM II's claim, Trustee ties the ECM II Loan transaction to U.S. Coal's rejection of the Macquarie deal, which Trustee argues occurred at Goggin and Goodwin's command. But even if a basis exists for this connection, ECM II was not organized until October 25, 2011, weeks after U.S. Coal and Macquarie failed to reach an agreement in late August 2011. ECM II cannot be liable for conduct that Goodwin and Goggin allegedly engaged in before ECM II was formed.[7] Finally, Trustee contends that "Goggin and Goodwin pushed ECM II through with no due diligence." [ECF No. 231 at 120-21.] To the extent this is correct—and Trustee cites no evidence to establish this proposition—Trustee also does not offer any legal support for the argument that the U.S. Coal Board's failure to conduct due diligence on a loan transaction is ECM II's responsibility as the lender on that transaction.

For these reasons, ECM II's Motion is GRANTED; it is entitled to a summary judgment on Trustee's equitable subordination claim in Count 11.

---

[7] As discussed in Section II(C), *infra*, Trustee may continue to press her equitable subordination claim against Goodwin and Goggin in connection with this allegedly inequitable conduct.

**C.    Trustee's equitable subordination claim in Count 11 against Goodwin and Goggin will proceed to trial, and her equitable subordination claim in Count 16 will proceed only as against Goggin.**

This Court previously entered an order permitting Trustee's breach of fiduciary duty claim against Goodwin and Goggin to proceed to trial regarding contentions of wrongdoing that each committed.  In briefing the equitable subordination claims, Goodwin contends: "To succeed on her equitable subordination claims against Goodwin, the Trustee has the burden to provide evidence that some conduct of Goodwin was inequitable conduct—that is, conduct that rose to the level of fraud, illegality, or breach of fiduciary duty."  [ECF No. 239 at 15.]  The Court agrees that any breaches of fiduciary duty by Goodwin and Goggin would be inequitable conduct by insiders that could support Trustee's equitable subordination claims against them.  Moreover, at the summary judgment stage, the Court finds that a material dispute of fact exists regarding whether the potential breaches of fiduciary duty by Goodwin and Goggin injured creditors or unfairly advantaged Goodwin and Goggin, and that equitable subordination of Goodwin and Goggin's claims based on the asserted breaches of fiduciary duty would be consistent with the Code.

Trustee may continue to pursue her equitable subordination claims against Goodwin and Goggin only to the extent that Trustee may move forward against each of them under Count 7 based on specific challenged transactions.  *See generally Spradlin v. E. Coast Miner, LLC (In re Licking River Mining, LLC)*, No. 15-1004, 2019 WL 1430213 (Bankr. E.D. Ky. March 27, 2019).  For example, because the Court previously found that Trustee may not further pursue Goodwin and Goggin under Count 7 for the payment of Goggin and ECM's legal fees, Trustee may not contend at trial that such conduct warrants equitable subordination under Count 11.  However, because the breach of fiduciary duty claim continues to trial against both Goodwin and

28

Goggin regarding the so-called Macquarie deal, Trustee also may seek to equitably subordinate Goodwin and Goggin's claims under Count 11 based on their conduct pertaining thereto.

Relatedly, the Court previously held that a statute of limitations barred Trustee from pursuing her breach of fiduciary duty claims against Goggin and Goodwin regarding certain challenged transactions; *i.e.*, U.S. Coal's $800,000 transfer to USCM and a severance agreement made with former U.S. Coal CEO Robert Gabbard. *Id*. at *7-15.  That limitations period does not apply to Trustee's equitable subordination claims.  Nevertheless, the Court concludes that Trustee may not pursue her equitable subordination claim in Count 11 against Goodwin or Goggin based on that conduct, either.  Specifically, Trustee may not argue at trial that their claims should be equitably subordinated based on U.S. Coal's payment of $800,000 to USCM. Trustee has not established that a genuine dispute of material fact exists to support her argument that Goodwin and Goggin engaged in inequitable conduct in connection with this transfer.  They were not on U.S. Coal's Board at the time of the payment and could not have caused it to occur.

In addition, Trustee may not contend at trial that Goodwin and Goggin's claims should be equitably subordinated based on the U.S. Coal Board's decision to approve a severance agreement with its former CEO.  Trustee has not established that a genuine dispute of material fact exists to support her argument that Goodwin and Goggin engaged in inequitable conduct in connection with this transaction, nor does she argue that this particular transaction warrants equitable subordination of Goodwin and Goggin's claims.

Finally, as to Count 16, because Trustee may continue to pursue her breach of fiduciary duty claim against Goggin but not Goodwin concerning the 2013 Amended Notes, Trustee only may continue to pursue equitable subordination against Goggin in Count 16.

29

Therefore, for these reasons, Goodwin and Goggin's Motions on Count 11 are DENIED.

Goggin's Motion on Count 16 is DENIED.  Goodwin's Motion on Count 16 is GRANTED.

## III.    Claims for Avoidance of Constructively Fraudulent Transfers.

### A.    Legal Standards.

#### 1.    Avoidance Under Kentucky State Law.

Trustee seeks avoidance of alleged constructively fraudulent transfers or obligations

incurred to Defendants by exercising her "strong arm" powers under § 544(b)(1),[8] which

authorizes a trustee to "avoid any transfer of an interest of the debtor in property or any

obligation incurred by the debtor that is voidable under applicable law by a creditor holding an

unsecured claim that is allowable under section 502 of this title . . . ."  11 U.S.C. § 544(b)(1).

"Essentially, this provision permits the trustee to 'stand in the shoes' of an unsecured creditor

and assert causes of action under state fraudulent conveyance laws for the benefit of all

creditors."  *Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 330 (B.A.P. 6th Cir. 2007) (citations

omitted).  "[T]o nullify a transfer under § 544(b)(1), the trustee must prove by a preponderance

of the evidence that there is '(1) [a] creditor, (2) holding an allowable unsecured claim; and (3) a

transfer of an interest of the debtor in property, (4) that is voidable under applicable [state] law.'"

*Solomon v. Fellmy (In re Felsner)*, 289 F. App'x 879, 882 (6th Cir. 2008) (quoting *Forbes*, 372

B.R. at 330).

Trustee seeks application of Kentucky fraudulent conveyance law in K.R.S. § 378.020,

which "voids transfers made 'without valuable consideration' as to creditors existing at the time

of the transfer."  *Brown v. Raygoza (In re Addington)*, No. 14-1008, 2015 WL 3404505, at *4

---

[8] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

(Bankr. E.D. Ky. May 27, 2015) (quoting K.R.S. § 378.020). The applicable version of that

statute provides:

> Every gift, conveyance, assignment, transfer or charge made by a debtor, of or upon
> any of his estate without valuable consideration therefor, shall be void as to all his
> then existing creditors, but shall not, on that account alone, be void as to creditors
> whose claims are thereafter contracted, nor as to purchasers from the debtor with
> notice of the voluntary alienation or charge.

K.R.S. § 378.020 (repealed Jan. 1, 2016).[9]

"Upon successfully meeting [the] threshold test [of establishing the existence of a

creditor holding an allowable unsecured claim under § 544(b)], the Trustee must by clear and

convincing proof establish that the transfers in question are voidable under . . . K.R.S. 378.020."

*Harris v. Nat'l Inv. & Fin. Co., Inc. (In re Akin)*, 64 B.R. 510, 513 (Bankr. W.D. Ky. 1986)

(citing *Russell Cty. Feed Mill, Inc. v. Kimbler*, 520 S.W.2d 309, 311 (Ky. 1975)). Actions for

relief under K.R.S. § 378.020 are subject to a five-year statute of limitations under the version of

K.R.S. § 413.120(12) that was in effect as of each of the Petition Dates.[10] Thus, the "lookback

period" for the conveyances at issue in this case is five years from the transferring Debtor's

Petition Date.

"As interpreted by Kentucky courts, a transfer made without valuable consideration is

one in which the thing conveyed 'exceed[s] in value by a substantial sum' the consideration

given." *Addington*, 2015 WL 3404505, at *4 (quoting *Pope v. Cawood*, 168 S.W.2d 985, 988

(Ky. 1943)). To be valuable, consideration "must not be inadequate." *Carter v. Richardson*, 60

S.W. 397, 399 (Ky. 1901). Rather, it must be "sufficient." *Schilling v. Montalvo (In re*

---

[9] K.R.S. § 378.020 was repealed on January 1, 2016, when Kentucky adopted the Uniform Voidable Transactions
Act at K.R.S. §§ 378A.005 to .140. Transfers "occurring prior to [the UVTA's] enactment must be considered
under the repealed chapter 378, which was in effect at the time of the pertinent transfers." *Spradlin v. Pryor
Cashman LLP (In re Licking River Mining, LLC)*, 565 B.R. 794, 798 n.3 (Bankr. E.D. Ky. 2017). The alleged
transfers in this case were made prior to May 22, 2014, so now-repealed K.R.S. § 378.020 applies.

[10] K.R.S. § 413.120 was amended effective June 24, 2015.

*Montalvo)*, 333 B.R. 145, 149 (Bankr. W.D. Ky. 2005).  "[A] transfer for less than 'a fair and

reasonable price' is void."  *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 319 B.R. 134, 140

(Bankr. E.D. Ky. 2004),[11] *aff'd*, 196 F. App'x 337 (6th Cir. 2006)).  In contrast, a dollar-for-

dollar reduction of a debtor's debt constitutes valuable consideration.  *Lisle v. John Wiley &

Sons, Inc. (In re Wilkinson)*, 196 F. App'x 337, 344 (6th Cir. 2006).[12]

Value is determined at the time of the transfer.  "Since the purpose of KRS 378.020 is to

put the creditors back in the same position they would have enjoyed immediately prior to the

voidable conveyance, . . . . [t]he creditor can get today only what he could have gotten then."

*Mattingly v. Gentry*, 419 S.W.2d 745, 747 (Ky. 1967) (citations omitted)).

## 2.    Avoidance Under the Bankruptcy Code.

Trustee also seeks avoidance of alleged constructively fraudulent transfers or obligations

incurred to Defendants under the Bankruptcy Code.  Section 548(a)(1)(B) provides in relevant

part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the
> benefit of an insider under an employment contract) of an interest of the debtor in
> property, or any obligation (including any obligation to or for the benefit of an
> insider under an employment contract) incurred by the debtor, that was made or
> incurred on or within 2 years before the date of the filing of the petition, if the
> debtor voluntarily or involuntarily--
> . . .
> (B) (i) received less than a reasonably equivalent value in exchange for such
> transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation
> was incurred, or became insolvent as a result of such transfer or obligation;
> . . . .

---

[11] This case is referred to herein as "*Wilkinson I*."

[12] This case is referred to herein as "*Wilkinson II*."

11 U.S.C. § 548(a)(1)(B). For Trustee to succeed on her § 548(a)(1)(B) claims, she must prove by a preponderance of the evidence that: "(1) the [d]ebtor transferred an interest in property; (2) the transfer took place within two years before the bankruptcy was filed; (3) the debtor was insolvent on the date the transfer was made or became insolvent as a result of the transfer; and (4) the debtor received less than reasonably equivalent value." *Wheatley v. Johnson (In re Johnson)*, 579 B.R. 796, 802 (Bankr. W.D. Ky. 2017) (citation omitted).

Whether a debtor received "less than reasonably equivalent value" under § 548(a)(1)(B) "is a factual finding by the Court and in general, the concept requires that if there is any significant disparity between the market value of what the Debtor gave and what she received, a finding of reasonably equivalent value is precluded." *Johnson*, 579 B.R. at 802 (citation omitted). "A court considering this question should first determine whether the debtor received any value in the exchange," and "[i]f so, the court should determine if the value received was reasonably equivalent." *Wilkinson II*, 196 F. App'x at 337 (citation omitted). "The date for determining reasonable equivalence is the date of the transfer." *Id.* at 342 (citations omitted).

A dollar-for-dollar reduction in debt constitutes reasonably equivalent value. *Id.* at 343. Other factual scenarios require a valuation determination. The Sixth Circuit explained:

> Though the Bankruptcy Code does not define "reasonably equivalent value," it does define "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). "[A] determination of whether value was given under Section 548 should focus on the value of the goods and services provided rather than on the impact the goods and services had on the bankrupt enterprise." *In re Financial Federated Title & Trust, Inc.*, 309 F.3d 1325, 1332 (11th Cir. 2002). This determination depends on the circumstances of each case and not on a fixed mathematical formula. *See In re Humble,* 19 Fed. Appx. at 200; *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997); *In re R.M.L., Inc.*, 92 F.3d 139, 145 (3d Cir. 1996). Fair market value is one factor the bankruptcy court may consider. *Barber*, 129 F.3d at 387. Whether the bankruptcy court used proper methodology in assessing value is an issue of law reviewed *de novo*. *In re Dunham*, 110 F.3d 286, 289–90 n.11 (5th Cir. 1997).

33

Value can be in the form of either a direct economic benefit or an indirect economic benefit. "It is well settled that 'reasonably equivalent value can come from one other than the recipient of the payments, a rule which has become known as the indirect benefit rule.'" *In re Northern Merchandise, Inc.*, 371 F.3d 1056, 1058 (9th Cir. 2004) (quoting *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d 479, 485 (4th Cir. 1992)). The indirect benefit rule was first explained in *Rubin v. Manufacturers Hanover Trust Co.*:

> [A] debtor may sometimes receive "fair" consideration even though the consideration given for his property or obligation goes initially to a third person.... [T]he transaction's benefit to the debtor need not be direct; it may come indirectly through benefit to a third person.... If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and [the statute] has been satisfied— provided, of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up.

661 F.2d 979, 991–92 (2d Cir. 1981) (internal quotation marks and citations omitted).

*Wilkinson II*, 196 F. App'x at 341-42. Any such indirect benefit must be "concrete and quantifiable." *Id.* at 342 (citations omitted).

## B.    Application of Law.

Count 5 (against ECM II), Count 8 (ECM), Count 10 (ECM and Goggin), Count 13 (all Defendants), and Count 14 (Goodwin and Goggin) each assert constructive fraud claims based in part on the Kentucky law reviewed above and in part on § 548(a)(1)(B). Count 17 (Goodwin and Goggin) asserts a constructive fraud claim based solely on § 548(a)(1)(B). Defendants moved for summary judgment on all counts. Trustee moved for partial summary judgment only on selected transfers in Count 5.

### 1.    Trustee and ECM II filed cross-motions on Count 5, regarding the ECM II Loan.

Pursuant to K.R.S. § 378.020, Count 5 seeks to avoid as constructively fraudulent:

(a) obligations JAD Debtors incurred to ECM II by guaranteeing $1,322,406.38 of the ECM II

34

Loan; (b) obligations LR Debtors incurred to ECM II by guaranteeing $5,407,016.22 of the ECM II Loan; and (c) transfers JAD Debtors and LR Debtors made to ECM II by granting liens on all their assets to secure their respective guarantees.  Under both Kentucky law and § 548(a)(1)(B), Count 5 also seeks avoidance of payments to ECM II on the ECM II Loan totaling $776,929.68 within two years preceding LR Debtors' and JAD Debtors' respective Petition Dates, as defined above.

The material terms of the ECM II Loan are undisputed.  Simply stated, before the ECM II Loan transaction, LR Debtors were not obligated on the CAM JAD Bridge Notes.  As part of the ECM II Loan transaction, LR Debtors became liable for and granted liens to secure the entirety of the ECM II Loan, approximately $1.3 million of which was used to pay off the CAM JAD Bridge Notes.  Trustee contends that LR Debtors received no consideration for their transfers to ECM II.

Similarly, before the ECM II Loan transaction, JAD Debtors were not obligated on the 2008 Bridge Notes.  As part of the ECM II Loan transaction, JAD Debtors became liable for and granted liens to secure the entirety of the ECM II Loan, approximately $5.4 million of which was used to pay off the 2008 Bridge Notes, except for those owed to Goodwin and Goggin.  Trustee contends that JAD Debtors received no consideration for their transfers to ECM II.

Finally, ECM II received payments on the ECM II Loan within the two years preceding LR Debtors' and JAD Debtors' respective Petition Dates.  Trustee contends that those payments must be avoided as lacking sufficient consideration because the obligations giving rise to those payments are avoidable.

Trustee seeks a partial summary judgment as to avoidance of LR Debtors' guarantees and liens. ECM II seeks a summary judgment on all aspects of Count 5, including LR Debtors' and JAD Debtors' guarantees and liens and the payments that ECM II received.

### a.    Trustee is entitled to a summary judgment on Count 5 as to LR Debtors' guarantees and liens granted to ECM II.

As to the LR Debtors' transfers, the sole disputed issue is whether LR Debtors received "valuable consideration" under K.R.S. § 378.020 in exchange for the guarantees and liens they granted to ECM II. To support her Motion, Trustee claims that there is no evidence that LR Debtors received "valuable consideration" for those transfers. Specifically, Trustee claims that LR Debtors became liable for approximately $6.7 million in secured debt via the ECM II Loan as opposed to the approximately $1.3 million of unsecured debt they owed previously. ECM II resists Trustee's attempted isolation of LR Debtors, asserting that it is entitled to summary judgment on Count 5 in its entirety because all Debtors, including LR Debtors, received "substantial direct and indirect benefit" from the ECM II Loan. [ECF No. 225 at 13.] In support, ECM II claims generally that:

(a)    LR Debtors received a direct benefit from the $1.3 million reduction in higher-interest-rate debt that was maturing in 24 days; or, if not,

(b)    there were concrete indirect benefits from the refinancing of higher-interest-rate debt just before maturity; or,

(c)    because Debtors operated as a single business enterprise, all Debtors received a direct benefit from any reduction of antecedent debt through the ECM II Loan.

ECM II's last contention is without merit. Trustee is the trustee for each of the ten Debtors. Debtors' cases have not been substantively consolidated. It is undisputed that Debtors operated via a centralized cash management system whereby parent U.S. Coal collected the income of its subsidiaries, paid their expenses, and performed certain administrative functions.

36

Debtors shared accounting, financial, marketing, human resources, and information technology

services at the U.S. Coal level.  Cases cited by Trustee make clear that merely using a common

cash management system and/or management, in and of itself, is insufficient to establish that a

benefit to one is a benefit to all.[13]  *Fletcher v. Atex*, 68 F.3d 1451, 1458-59 (2d Cir. 1995)

(subsidiary's "participation in [parent's] cash management system is consistent with sound

business practice and does not show undue domination or control" sufficient to disregard the

parties' corporate form) (citation omitted); *Japan Petroleum Co. (Nigeria) v. Ashland Oil, Inc.*,

456 F. Supp. 831, 846 (D. Del. 1978) ("Common sense suggests that . . . parent corporations

should be able to establish certain common management programs which promote administrative

convenience without destroying the immunity of the parent from liability for the obligations of

its . . . subsidiaries, at least when those subsidiaries function as operating entities."); *Frost v.

Adileta (In re Teleservices Group, Inc.)*, No. 03-17230, 2009 WL 838157, at *14-15 (Bankr.

D.N.J. Jan. 15, 2009) (a "cash management system [is] a function of administrative convenience

and economy" and "within the context of piercing the corporate veil, a centralized cash

management system, without considerably more, is typically insufficient to justify disregarding

the corporate form") (citations and internal quotation marks omitted).

Clarity comes from casting the issue in terms of liabilities—for a debt to create a

common liability, piercing the corporate veil (or substantive consolidation) is required.  There is

no basis to arbitrarily view the benefit side any differently.  More than Debtors' use of a

---

[13] There is a dearth of discussion in existing case law regarding the role of centralized cash management systems in fraudulent transfer actions.  In fact, most literature discusses avoidance of transfers among debtors in multi-debtor bankruptcy cases, which is certainly not the case here, where Trustee is pursuing fraudulent transfer claims against creditors on behalf all ten Debtors.  *See, e.g.,* Paul D. Sinclair and Brendan L. McPherson, *Centralized Cash-Management and Avoidance Actions:  Part I*, AM. BANKR. INST. J., Apr. 2016, at 18; Paul D. Sinclair and Brendan L. McPherson, *Centralized Cash-Management and Avoidance Actions: Part II*, AM. BANKR. INST. J., Apr. 2017, at 48.

centralized cash management system and common management must be shown to evidence consideration to LR Debtors in exchange for assuming liability for $5.4 million in additional debt.

Turning next to the "concrete indirect benefits" that ECM II claims LR Debtors received from the ECM II Loan, while a benefit may be indirect, it is still subject to quantification. To defeat Trustee's Motion and prevail on its own Motion, ECM II must identify evidence in the record demonstrating the existence and value of the claimed indirect benefit. This it has failed to do. Although it is undisputed that the 2008 Bridge Notes, which LR Debtors guaranteed, were to mature in less than thirty days and that the interest rate on the ECM II Loan was lower (18% versus 20%),[14] there is no evidence that quantifies this "benefit" or compares it to the substantial and disproportionate indebtedness incurred by LR Debtors. Similarly, ECM II's direct benefit claim is without merit. The refinance of $1.3 million of unsecured debt via a new obligation of $6.7 million and all-asset liens, without more, does not constitute valuable consideration. Rather, the undisputed material facts demonstrate that LR Debtors' guarantees and all-asset liens to ECM II "exceed in value by a substantial sum" the consideration they received from ECM II through the ECM II Loan. *Addington*, 2015 WL 3404505, at *4 (citation omitted).[15]

Trustee is entitled to a partial summary judgment on Count 5 to the extent it seeks avoidance of LR Debtors' guarantees of the ECM II Loan and the corresponding liens they pledged to secure the avoided guarantees.

---

[14] Upon default, the ECM II Loan contract rate increased by 5% to a total interest rate of 23%.

[15] ECM II relies on *Wilkinson II*, 196 F. App'x at 342, and *Montalvo*, 333 B.R. at 150, to support its argument that an indirect benefit can constitute "valuable consideration" under Sixth Circuit precedent. Both cases discuss indirect benefits in the context of an § 548(a)(1)(B) constructive fraud claim under the Bankruptcy Code, not a K.R.S. § 378.020 claim under Kentucky law, which is at issue here. Because ECM II did not demonstrate the presence of concrete, indirect benefits in any event, this Court need not determine whether Kentucky law recognizes that a properly-proven concrete, indirect benefit could constitute "valuable consideration" under K.R.S. § 378.020.

        **b.**        **ECM II is not entitled to a summary judgment on Count 5 as to JAD Debtors' guarantees and liens granted to ECM II.**

ECM II also moved for a summary judgment as to Trustee's constructive fraudulent transfer claim regarding JAD Debtors' liens and guarantees.  As with LR Debtors, the sole issue regarding JAD Debtors is whether they received "valuable consideration" under K.R.S. § 378.020 in exchange for the guarantees and liens they granted to ECM II.  Trustee claims that the ECM II Loan rendered JAD Debtors liable for approximately $6.7 million in secured debt as opposed to the approximately $5.4 million in unsecured debt that they owed before the ECM II Loan transaction.[16]  ECM II's arguments concerning the value that Debtors received in exchange for their guarantees and liens did not differentiate materially between JAD Debtors and LR Debtors, and the Court's evaluation of those arguments relating to LR Debtors applies to JAD Debtors.  For the reasons discussed regarding LR Debtors, Trustee has identified evidence that JAD Debtors did not receive valuable consideration in exchange for their liens and guarantees that is sufficient to defeat ECM II's Motion.  ECM II is not entitled to summary judgment on that portion of Count 5.

        **c.**        **ECM II is entitled to a summary judgment on Count 5 as to payments made to ECM II.**

ECM II also requested a summary judgment as to payments totaling $776,929.68 that it received within two years of the transferring Debtors' Petition Dates.  Trustee avers in the Amended Complaint that LR Debtors' assets were used to make payments to ECM II on the portion of the ECM II Loan that was used to pay the CAM JAD Bridge Notes, which LR Debtors did not owe.  She contends that, because ECM II does not have valid liens and claims against LR

---

[16] Although Trustee identifies Harlan as a JAD Debtor, Harlan was not obligated under the CAM JAD Bridge Notes [ECF No. 198-9].

Debtors for that portion of the ECM II Loan, any use of LR Debtors' assets to pay ECM II on that portion is a fraudulent transfer recoverable from ECM II.  Trustee makes the same assertions to the extent that JAD Debtors' assets were used to make payments to ECM II on the portion of the ECM II Loan that was used to pay the 2008 Bridge Notes, which JAD Debtors did not previously owe.

ECM II argues that "vaguely asserting that the subsidiaries' 'assets were used' to make payments to ECM II without any proof is insufficient to prevail" on Count 5, and "[t]here is no evidence identifying what specific payments were made directly to ECM II or through U.S. Coal." [ECF No. 190-1 at 22, 21.]  Trustee's response relies on her expert Elizabeth Woodward's report ("Woodward Report"), which Trustee describes as "detailing the source of payments to ECM II." [ECF No. 231 at 138.]  Trustee highlights the Woodward Report's conclusions that:  (a) funds that U.S. Coal used to pay ECM II originated from its subsidiaries; (b) 99.9% of deposits in U.S. Coal's Chase Bank account originated from the subsidiaries; and (c) 100% of the deposits made in the 14 days immediately prior to each payment to ECM II originated from subsidiaries, with LR Debtors accounting for 96.9% of same.  "Based on these facts," Trustee concludes, "if this Court avoids the liens and claims of ECM II against the [LR] and/or JAD Debtors . . . then the Trustee may recover payments to ECM II that indisputably originate from such Debtors' assets." [*Id.*]

Trustee's logic is flawed.  This payment avoidance claim is predicated upon first avoiding the transferring Debtor's obligation to ECM II.  But it is undisputed that U.S. Coal made all payments that Trustee seeks to avoid, and Trustee did not seek avoidance of U.S. Coal's obligation to ECM II – only LR Debtors' and JAD Debtors' obligations.  Trustee's reference to "payments to ECM II that indisputably originate from [LR Debtors' and/or JAD] Debtors'

assets" indicates her opinion that Ms. Woodward's tracing of funds in U.S. Coal's account at the time it paid ECM II is important to this claim.  [ECF No. 231 at 138.]  Yet, Trustee did not explain the relevance of how U.S. Coal obtained the funds it ultimately paid ECM II.  She neither cited facts indicating that U.S. Coal acted as a conduit between LR Debtors and/or JAD Debtors and ECM II, nor alleged that those subsidiary Debtors dictated how U.S. Coal could use funds it swept from their accounts as part of Debtors' cash management system.   As reviewed above, the mere existence of a centralized cash management system is an insufficient basis upon which to disregard the corporate form.  Instead, the undisputed facts are that U.S. Coal controlled the funds in its accounts, U.S. Coal owed a debt to ECM II (that Trustee has neither challenged in this action nor cited another's challenge in a separate action), and U.S. Coal made payments to ECM II on that debt.  Trustee cannot simply ignore U.S. Coal's role in the ECM II Loan payment equation.

ECM II is entitled to a summary judgment on Count 5 to the extent it seeks avoidance of payments made to ECM II.

### d.    Conclusions as to Count 5.

For the foregoing reasons, Trustee's Motion on her Count 5 claim to avoid LR Debtors' guarantees and liens is GRANTED.  ECM II's Motion is GRANTED to the extent it seeks a summary judgment on Trustee's Count 5 claim to avoid payments to ECM II.  ECM II's Motion is DENIED to the extent it seeks a summary judgment regarding Trustee's Count 5 claim to avoid LR Debtors' and JAD Debtors' guarantees and liens.

### 2.    ECM is not entitled to a summary judgment on Count 8, regarding the USCM transaction.

In Count 8, Trustee seeks to avoid the $800,000 payment that U.S. Coal made to USCM on September 30, 2009, as a constructively fraudulent transfer under Kentucky law.  Count 8

seeks recovery of the avoided transfer from ECM, which Trustee claims is the party for whose

benefit the transfer was made under § 550(a)(1).  Count 8 also seeks avoidance and recovery of

U.S. Coal's payments to ECM totaling $99,846.98 during the two years preceding its Petition

Date as constructively fraudulent under both Kentucky law and § 548(a)(1)(B).  Only ECM

moved for summary judgment on Count 8.  The parties' sole dispute is whether U.S. Coal

received "valuable consideration" for the $800,000 transfer to USCM under K.R.S. § 378.020.

ECM contends that the $800,000 transfer was made either to satisfy accrued bonuses (and

thereby yielded a dollar-for-dollar reduction in debt) or to incentivize managers to remain in U.S.

Coal's employ (and thereby generate value in the form of employee retention).  In support, ECM

cites:  (a) emails with attached letters from former U.S. Coal Board members to then-CEO

Robert Gabbard approving bonuses in February 2009; (b) transcripts from depositions in which

former U.S. Coal executives made statements supporting ECM's accrued bonus argument; and

(c) "Restricted Company Interest Agreements" referencing "incentive compensation" that U.S.

Coal entered into with each manager after the $800,000 transfer ("RCI Agreements").  ECM also

references two emails and language in U.S. Coal's 2009 audited financial statements supporting

the notion that the $800,000 was related to employee services.

Trustee disputes ECM's explanation, arguing that U.S. Coal did not receive valuable

consideration for the transfer and that its sole purpose was to favor ECM at the expense of other

creditors.  She contends that there is no evidence that U.S. Coal owed bonuses.  She highlights:

(a) the bonus amounts approved in February 2009 are not the same as the $100,000 per employee

that U.S. Coal transferred to USCM in September 2009; (b) Julia McAfee and Jeff Dean both

testified at deposition that they were not aware they received bonuses via USCM until after the

$800,000 transfer; (c) minutes from the October 13, 2009 meeting, during which U.S. Coal's

42

Board ratified and approved the transfer, state that U.S. Coal "invested $800,000 on behalf of eight individuals . . . in ECM via USCM" and do not mention a bonus or incentivization to employees; and (d) portions of the RCI Agreements could belie the notion of a bonus.  [ECF No. 231 at 142-45.]  Trustee also relies on emails that Goggin and Goodwin sent in the days preceding the $800,000 transfer.  In one email, Goggin characterizes management's participation as "huge" and states that it "virtually guarantees that we are all in the same boat and that the guys who are doing the actual rowing are rowing as fast as they can."  [ECF No. 235-8 at 1.]  In another email, Goodwin indicated that he could add money to ECM if management could not, but he "would prefer to press them; ideally they spend their last savings and become manically focused on paying off the loan."  [ECF No. 203-9 at 1.]

The Court finds that there is a genuine dispute of material fact as to what consideration, if any, U.S. Coal received in exchange for its $800,000 transfer to USCM and whether it was sufficiently "valuable" within the meaning of K.R.S. § 378.020.  ECM is not entitled to summary judgment as to the $800,000 transfer.

Count 8 also seeks to avoid a $99,846.98 portion of U.S. Coal's payments to ECM during the two years preceding its Petition Date as constructively fraudulent transfers under both Kentucky law and § 548(a)(1)(B).  As to this claim, ECM simply argues:  "The Trustee also seeks to recover any . . . debt payments U.S. Coal made to ECM to the extent they represented USCM's interest in said payments.  But because the claim to avoid the initial payment to USCM fails, so too does the Trustee's claim regarding subsequent payments."  [ECF No. 189-1 at 32.] ECM's undeveloped argument is thus predicated solely upon its success in defeating Trustee's claim to avoid the $800,000 transfer that enabled USCM to own the interest in ECM.  Because

ECM is not entitled to a summary judgment on the $800,000 transfer, it likewise is not entitled to

a summary judgment as to the subsequent $99,846.98 transfers.

For these reasons, ECM's Motion as to Count 8 is DENIED.

### 3.    ECM and Goggin are entitled to a summary judgment on Count 10, regarding payments to The Nelson Law Firm.

On September 16, 2010, U.S. Coal noteholder Lawrence Kaplan filed suit against U.S.

Coal in state court in New York, contending that U.S. Coal breached a contract in connection

with his "put rights."  U.S. Coal retained Pryor Cashman LLP to defend the Kaplan lawsuit.

ECM retained The Nelson Law Firm ("NLF") to represent its interests and directed NLF to try to

intervene into that lawsuit on ECM's behalf.

On February 14, 2012, the CAM Entities filed a lawsuit against U.S. Coal, ECM, Goggin,

and Goodwin, among others, in New York state court.  The CAM Entities asserted breaches of

contract by various defendants and contended that the director and officer defendants named in

that lawsuit "engage[d] in a pattern of interested transactions and self-dealing resulting in the

unfair dilution of US Coal common stock and misappropriation of corporate resources."  [ECF

No. 196-4 at ¶ 2.]  U.S. Coal engaged Nixon Peabody LLP to act as its counsel in the CAM

lawsuit, and that firm also represented Goodwin and other defendants in the suit.  ECM and

Goggin both retained NLF to defend their interests in the CAM lawsuit.  U.S. Coal paid bills

from NLF associated with the Kaplan and CAM lawsuits through December 2013.

In Count 10, Trustee seeks to avoid payments totaling $1,830,242.86 that U.S. Coal made

to NLF on behalf of ECM and Goggin as constructively fraudulent, including $1,065,564.58 paid

within two years preceding U.S. Coal's Petition Date.  Trustee seeks to avoid the entire amount

pursuant to Kentucky law and to avoid the two-year portion pursuant to both Kentucky law and

§ 548(a)(1)(B).  Count 10 seeks recovery of those transfers from ECM and Goggin as the parties

for whose benefit the transfers were made under § 550(a).  Only ECM and Goggin seek a

summary judgment on Count 10.  The parties' sole dispute is over whether U.S. Coal received

"valuable consideration" for its payments to NLF under K.R.S. § 378.020 and/or "reasonably

equivalent value" for same under § 548(a)(1)(B).

>            **a.        ECM is entitled to a summary judgment on Count 10.**

ECM relies on the terms of its loan documents to support its contention that U.S. Coal

received valuable consideration and reasonably equivalent value for the NLF fee payments.  The

ECM Credit Agreement incorporated certain provisions from the prior JMB Credit Agreement,

including the following:

> SECTION 8.03 Expenses; Indemnity; Damage Waiver. (a) The Borrower shall
> pay . . . (ii) all out-of-pocket expenses incurred by any Lender, including the fees,
> charges and disbursements of any counsel for such Lender (whether outside
> counsel or the allocated costs of its internal legal department), in connection with
> the enforcement, collection or protection of its rights in connection with the Loan
> Documents, including its rights under this Section, or in connection with the Loan
> made hereunder, including all such out-of-pocket expenses incurred during any
> workout, restructuring or negotiations in respect of the Loan.

[JMB Credit Agreement, ECF No. 198-10, at 58-59; *see also* ECM Credit Agreement, ECF No.

197-7, at 10.]

It is undisputed that NLF's fees were almost exclusively incurred in the Kaplan and CAM

lawsuits.  ECM contends that both actions related to the "enforcement, collection or protection of

its rights in connection with the Loan Documents," and thus invoked U.S. Coal's indemnity

obligation.  Consequently, ECM argues that U.S. Coal had a legal obligation to pay ECM's NLF

fees.  Once ECM incurred the fees, they became U.S. Coal's debt, and U.S. Coal received

"valuable consideration" and "reasonably equivalent value" for its fee payments in the form of

dollar-for-dollar reductions in those debts.

Trustee does not question that ECM had a right to indemnification from U.S. Coal under

its loan documents, but she argues that such right "did not give its attorneys *carte blanche* to

charge unreasonable or excessive fees to U.S. Coal." [ECF No. 231 at 151.] She posits that U.S.

Coal could not have received "reasonably equivalent value" or "valuable consideration" for

NLF's fees if they were unreasonable under the New York law that governs the JMB Credit

Agreement and, by extension, the ECM Credit Agreement.[17]  She claims that the reasonableness

of NLF's fees is a material factual dispute, relying in large part on Windisch's deposition

testimony referring to the fees as "egregious" and his 2013 email to NLF complaining about the

fees charged. [ECF No. 202-3 at 25.] The email references U.S. Coal's "alarm" because the

NLF fees were three times that of U.S. Coal's counsel, Nixon Peabody, and it requests that NLF

provide a budget for future fees. [ECF No. 234-9 at 1.] Trustee also cites Collins' deposition

testimony about his belief that NLF was charging too much and Stephen Nelson's deposition

testimony that Trustee summarized as "[i]t was the only time in [NLF's] history that Mr. Nelson

could recall sending two versions of invoices, one of them providing little detail." [ECF No. 231

at 106.]

Trustee offered the same argument about NLF's fees in connection with her breach of

fiduciary duty claim against Goggin in Count 7, and this Court rejected that argument. *Licking

River Mining*, 2019 WL 1430213, at *19-22. It fails again for the same reasons. Trustee did not

challenge any particular charges. That NLF's fees may have been three times as much as Nixon

Peabody's, without more, is irrelevant, and neither Windisch nor Collins has been designated as

an expert regarding the reasonableness of attorney fees. That NLF's billing practices in these

---

[17] The ECM Credit Agreement modified certain portions of the JMB Credit Agreement and specifically states that
any terms not modified "remain applicable in their entirety." [ECF No. 197-7 at 10.] The "Governing Law
provisions" in Section 8.09(a) of the JMB Credit Agreement were not modified. [ECF No. 201-7 at 62.]

cases may have differed from those in other representations, without more, is also irrelevant.  To

defeat ECM's Motion, Trustee must demonstrate that the reasonableness issue is based on more

than the "mere existence of *some* alleged factual dispute" or mere allegations, and instead be

rooted in specific and properly-supported facts.  *Anderson*, 477 U.S. at 247-48 (emphasis in

original).  She failed to do so, and ECM is entitled to a summary judgment on Count 10.

 ECM's Motion as to Count 10 is GRANTED.

### b. Goggin is entitled to a summary judgment on Count 10.

 As a U.S. Coal Board member at the time of the NLF fee payments, Goggin relies on his

indemnification rights granted by U.S. Coal's corporate charter and by-laws, both of which were

in existence before Goggin joined the Board.  Section 6(b) of U.S. Coal's Second Amended and

Restated Certificate of Incorporation states:

> The Corporation shall have the power to indemnify any person who was or is a
> party or is threatened to be made a party to any threatened, pending or completed
> action, suit or proceeding . . . by reason of the fact that the person is or was a
> director . . . of the Corporation . . . against expenses (including attorneys' fees) . . .
> actually and reasonably incurred by the person in connection with such action,
> suit or proceeding if the person acted in good faith and in a manner the person
> reasonably believed to be in the best interests of the Corporation . . . .

[ECF No. 198-2 at 4-5.]  Article 8 of U.S. Coal's By-Laws states:

> No director shall be liable to the corporation or any of its stockholders for
> monetary damages for breach of fiduciary duty as a director, except with respect
> to (1) a breach of the director's duty of loyalty to the corporation or its
> stockholders, (2) acts or omissions not in good faith or which involve intentional
> misconduct or a knowing violation of law, (3) liability which may be specifically
> defined by law or (4) a transaction from which the director derived an improper
> personal benefit, it being the intention of the foregoing provision to eliminate the
> liability of the corporation's directors to the corporation or its stockholders to the
> fullest extent permitted by law.  The corporation shall indemnify to the fullest
> extent permitted by law each person that such law grants the corporation the
> power to indemnify.

[ECF No. 198-3 at 9.]

Goggin asserts that these provisions provided for his indemnification as a U.S. Coal director.  He contends that the NLF fees incurred on his behalf in the CAM lawsuit fell within his indemnification right, and U.S. Coal was thus obligated to pay them.  By doing so, Goggin concludes, U.S. Coal received "valuable consideration" or "reasonably equivalent value" in the form of a dollar-for-dollar reduction in debt.

Trustee does not dispute that Goggin generally had a right to indemnification under U.S. Coal's charter and By-Laws, but she argues that Goggin's conduct that caused him to incur the NLF fees renders the indemnification provisions inapplicable.  Trustee states that the lion's share of the fees U.S. Coal paid NLF were related to the CAM lawsuit in which CAM alleged that Goggin breached his fiduciary duty to U.S. Coal by favoring ECM's interests over other creditors.  Trustee contends that her breach of fiduciary duty claims in Count 7 of this action "contain many of the same underlying factual allegations as the CAM Lawsuit on these issues," and if she prevails, "U.S. Coal would have paid Goggin['s] . . . fees for . . . conduct . . . that qualifies as a breach of fiduciary duty to U.S. Coal."  [ECF No. 231 at 107.]  Accordingly, Trustee's sole argument, for which she cited no authority, is that U.S. Coal could not have received "reasonably equivalent value" or "valuable consideration" in exchange for paying fees incurred in defending Goggin for acts by which he breached his fiduciary duty to U.S. Coal.

Although portions of Trustee's Count 7 breach of fiduciary duty claim against Goggin survived summary judgment,[18] whether Trustee prevails on that claim at trial will not impact her ability to succeed on Count 10.  Trustee's Count 10 constructive fraud argument ignores the tenet that consideration is measured at the time of the transfer.  *Mattingly*, 419 S.W.2d at 747 (evaluating at K.R.S. § 378.020 claim and holding that "[t]he creditor can get today only what he

---

[18] *See Licking River Mining*, 2019 WL 1430213.

48

could have gotten then.") (citation omitted); *Wilkinson II*, 196 F. App'x at 342 (evaluating a

§ 548(a)(1)(B) claim and holding that "[t]he date for determining reasonable equivalence is the

date of the transfer.") (citations omitted).  Even if Trustee prevails on her Count 7 claim against

Goggin at trial, that ruling cannot be applied retroactively to invalidate U.S. Coal's

indemnification obligation to Goggin at the times of the NLF fee payments.  It is undisputed that,

during the period in which those payments were made, no court had found the indemnification

provisions to be invalid or found that Goggin breached his fiduciary duties to U.S. Coal, and no

lawsuit on either issue was pending.  While the NLF fees that U.S. Coal paid on Goggin's behalf

could be a measure of damages resulting from Goggin's alleged breach of his fiduciary duty to

U.S. Coal, Trustee failed to produce evidence from which a fact-finder could reasonably

conclude that U.S. Coal's fee payments to NLF were constructively fraudulent transfers when

made.

Goggin is entitled to a summary judgment, and Goggin's Motion as to Count 10 is

GRANTED.

### 4.     ECM and ECM II are entitled to a summary judgment on Count 13, regarding transfers that Debtors made to them on their claims.

In Count 13, Trustee seeks avoidance of all payments Debtors made to ECM and ECM II

within five years preceding their respective Petition Dates as constructively fraudulent transfers

under Kentucky law, and she seeks avoidance of payments made within two years preceding the

Petition Dates under Kentucky law and § 548(a)(1)(B).  Trustee asserts in the Amended

Complaint that:  (a) ECM and ECM II's claims should be equitably subordinated (under Count

11) or recharacterized as equity (under Count 12); and, in turn, (b) any transfers Debtors made to

ECM or ECM II on account of their "claims" should be avoided as constructively fraudulent

under Count 13 because Debtors received no value or consideration for them.  In other words,

Trustee contends that if ECM and ECM II's debts are invalidated, all payments Debtors made to ECM and ECM II on those debts were constructively fraudulent because Debtors could not have received value in exchange for them.  ECM and ECM II seek a summary judgment on Count 13.

ECM and ECM II argue that Trustee's success on her Count 13 constructive fraud claim rises and falls with the Court's ruling on her Count 12 recharacterization claim.  During oral argument, Trustee's counsel agreed that Count 13 is dependent on Count 12.  The Court granted a summary judgment herein to ECM and ECM II on Count 12.  Therefore, the Count 12 recharacterization claim cannot be a basis for Trustee's Count 13 constructive fraud claim.

The Amended Complaint asserts that equitable subordination is a separate basis for Trustee's constructive fraud claim.  As determined above, ECM II is entitled to a summary judgment on Trustee's Count 11 equitable subordination claim, but Count 11 will proceed to trial against ECM.  Trustee's Count 13 claim fails as to ECM II.

Even if Trustee ultimately prevails on Count 11 against ECM at trial, however, that ruling cannot be the basis for Trustee's Count 13 claim.  As this Court previously explained in this case, "[e]quitable subordination does not invalidate the claim but merely changes its priority which distinguishes it from debt recharacterization."   [ECF No. 135, May 11, 2017 Hr'g. Tr., at 16:7-14; *see also Antioch Co. Litig. Tr. v. Morgan*, 633 F. App'x 296, 301 (6th Cir. 2015) ("Equitable subordination does not challenge the existence or validity of a claim or interest, but challenges the priority of an allowed claim or an allowed interest for purposes of distribution.") (citing *In re Insilco Techs., Inc.,* 480 F.3d 212, 218 (3d Cir. 2007); *AutoStyle*, 269 F.3d at 744).] Thus, equitably subordinating ECM's debt would neither invalidate the debt nor release any Debtor from its underlying obligation to pay the debt.  Equitable subordination also would not dictate that a Debtor could not receive value in the form of debt reduction in exchange for its

payments to ECM. ECM and ECM II both made this argument in their briefs, and Trustee did not contest it.

For the foregoing reasons, the Court concludes that Trustee has not set forth sufficient evidence from which a fact-finder reasonably could find in her favor on Count 13. ECM and ECM II are entitled to a summary judgment, and ECM's Motion and ECM II's Motion as to Count 13 are GRANTED.

> **5.      Goodwin and Goggin are not entitled to a summary judgment on Count 14 regarding JAD Debtors' guarantees and liens relating to the 2013 Amended Notes.**

Under Count 14, Trustee seeks to avoid conveyances that JAD Debtors made as part of the 2013 Amended Notes transaction to Goodwin and Goggin under both Kentucky law and § 548(a)(1)(B). Trustee seeks to avoid:  (a) obligations JAD Debtors incurred by guaranteeing U.S. Coal's 2013 Amended Notes for $1,097,620.03 to each of Goodwin and Goggin; and (b) JAD Debtors' pledges of all their assets to secure those debts. Trustee requests that any avoided liens be preserved for the benefit of the applicable Debtors' estates pursuant to § 551. Goodwin and Goggin request a summary judgment dismissing Count 14.

The material terms of the 2013 Amended Notes transaction are not disputed; only consideration is at issue. Trustee claims that JAD Debtors received no value. Specifically, she contends that they increased their liabilities by guaranteeing payment of almost $2.2 million to Goodwin and Goggin for which they had no prior obligation, encumbered all their assets by pledging them to guarantee that debt, and received no benefit in return. Goodwin and Goggin contend there is sufficient evidence that JAD Debtors received "valuable consideration" under K.R.S. § 378.020 or "reasonably equivalent value" under § 548(a)(1)(B) in exchange for the challenged guarantees and pledges.

Goodwin and Goggin identify that value as follows: (a) a waiver of all defaults under the 2008 Bridge Notes (as amended and restated); (b) an interest rate reduction from 20% in the 2008 Bridge Notes to 12% in the 2013 Amended Notes; and (c) a six-month payment holiday on 2013 Amended Note payments during which interest did not accrue (collectively, the "2013 Note Attributes"). However, while these terms may appear beneficial, Goodwin and Goggin have failed to quantify any alleged value that JAD Debtors received. JAD Debtors were not liable to Goodwin or Goggin under the refinanced 2008 Bridge Notes and thus had no defaults requiring waiver, owed no interest to reduce, and owed no payments that required a holiday.

Goodwin and Goggin alternatively argue that, because U.S. Coal benefitted from the 2013 Amended Note transaction as obligor and U.S. Coal wholly owns JAD Debtors, JAD Debtors benefitted from the transaction because a "benefit to one Debtor was [a] direct benefit to another." [ECF No. 192-1 at 19.] For the same reasons discussed previously in relation to Count 5, this "benefit to one is a benefit to all" argument is without merit as to Count 14. *See* Section III(B)(1)(a), *supra.*

Goodwin and Goggin's only attempt to quantify a benefit is their argument that "U.S. Coal and its subsidiaries—including the JAD [Debtors]—took advantage of [the 2013 Note Attributes] by paying other creditors during [the] payment holiday," including making significant payments to Pryor Cashman LLP on U.S. Coal's debt, which three of the four JAD Debtors' assets secured.[19] [ECF No. 192-1 at 18.] Goodwin and Goggin rely on Pryor Cashman's proof of claim and a spreadsheet listing payments totaling $870,000 that U.S. Coal made to Pryor Cashman between March 1 and August 31, 2013. [ECF No. 198-19 at 17-18.] They did not

---

[19] Harlan was not a party to the Pryor Cashman Security Agreement [ECF No. 196-14 at 39].

identify the "other creditors" who allegedly were paid or quantify the amount they were paid, aside from Pryor Cashman.

While it is undisputed that U.S. Coal paid Pryor Cashman during the "payment holiday," Goodwin and Goggin cited no evidence that it was solely the holiday that allowed U.S. Coal to do so and thereby benefit JAD Debtors by reducing their exposure. They also did not identify payments that the holiday allowed JAD Debtors to make, either through U.S. Coal to Pryor Cashman or otherwise. Moreover, even if the payment holiday had allowed U.S. Coal to reduce JAD Debtors' exposure, JAD Debtors still would not have received "valuable consideration" or "reasonably equivalent value" from the 2013 Amended Note transaction when their $870,000 reduced exposure to Pryor Cashman is compared to their $2.2 million increased exposure to Goodwin and Goggin under the 2013 Amended Notes. Substituting one secured obligation to Pryor Cashman for another substantially greater one to Goodwin and Goggin did not provide JAD Debtors with valuable consideration or reasonably equivalent value

Goodwin and Goggin made one additional argument to support a judgment in their favor on Count 14: Trustee cannot show damage to the estate resulting from any pledge of assets to Goodwin or Goggin in exchange for refinancing and extending the 2008 Bridge Notes. They cite a Sixth Circuit opinion decided under the former Bankruptcy Act and three other opinions applying state law from Michigan, California, and New York.[20] Those cases are neither binding

---

[20] *See Melamed v. Lake Cty. Nat. Bank*, 727 F.2d 1399, 1402 (6th Cir. 1984) (in action to avoid transfer pursuant to § 67(d)(2)(d) of the Bankruptcy Act based on "actual intent . . . to hinder, delay or defraud either existing or future creditors," which was repealed in 1978, Sixth Circuit found that no fraudulent transfer occurred because plaintiff failed to establish that subject transfer caused "a diminution of the debtor's assets available to creditors"); *ADP Commercial Leasing, LLC v. Obeid*, No. 14-10549, 2016 WL 74880, at *4 (E.D. Mich. Jan. 7, 2016) (in action to avoid transfer under Michigan Uniform Fraudulent Transfer Act, finding that plaintiffs failed to state fraudulent transfer claim because "even if the transfer had not been made, there would not have been sufficient assets to satisfy [senior creditor's] lien, let alone Plaintiffs' junior interest"); *Mehrtash v. Mehrtash*, 93 Cal. App. 4th 75, 82 (Cal. Ct. App. 2001) (in action to set aside transfer under California Uniform Fraudulent Transfer Act, appellate court affirmed trial court's judgment for defendants where plaintiff failed to prove that she was injured by subject transfer); *Chemtex L.L.C. v. St. Anthony Enter., Inc., et al.*, 490 F. Supp. 2d 536, 542 (S.D.N.Y. 2007) (when

nor persuasive. Damages are not an element of a constructively fraudulent transfer under Kentucky law or the Bankruptcy Code. The remedy after avoidance pursuant to § 548(a)(1), or Kentucky law and § 544(b), is the recovery of an avoided transfer under § 550 and/or the preservation of same under § 551. Goodwin and Goggin's argument on this point is unavailing.[21]

For these reasons, Goodwin and Goggin are not entitled to a summary judgment on Count 14 under either Kentucky law or § 548(a)(1)(B), and their Motions are DENIED.

### 6. Goodwin and Goggin are entitled to a summary judgment on Count 17, relating to payments on the 2013 Amended Notes.

In Count 17, Trustee seeks avoidance of all payments Debtors made to Goodwin and Goggin within the two years preceding their respective Petition Dates as constructively fraudulent transfers under § 548(a)(1)(B). Trustee asserts in the Amended Complaint that: (a) Goodwin and Goggin's claims under the 2013 Amended Notes should be recharacterized as equity (under Count 12), equitably subordinated (under Counts 11 and 16), and/or avoided as fraudulent transfers (under Counts 14 and 15); and in turn, (b) any transfers Debtors made to Goodwin or Goggin on account of those "claims" should be avoided as constructively fraudulent under Count 17 because Debtors received no value or consideration for them. In other words, Trustee contends that if Debtors' obligations to Goodwin and Goggin are invalidated, all payments Debtors made to Goodwin and Goggin on account of those obligations were

---

evaluating whether plaintiff had standing to pursue fraudulent transfer claim under New York law, quoting another case as stating "a 'creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance . . . .'") (quoting *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 133 (N.Y. App. Div. 2d Dep't 1986)).

[21] Goodwin and Goggin made this same argument regarding related actual fraud Count 15, discussed below. The Court's conclusion regarding this argument under Count 14 applies equally to Count 15.

constructively fraudulent because Debtors could not have received value in exchange for them. Goodwin and Goggin seek summary judgment on Count 17.

The parties' arguments about Count 17 are not well developed. Goodwin and Goggin argue that Trustee's success on her Count 17 constructive fraud claim is dependent on her success on her Count 12 recharacterization claim. Trustee responded with a footnote:

> Count [17] is not derivative of Count [12] as to Goodwin and Goggin, as they suggest, because Count [17] is not dependent on recharacterizing debt as equity. Rather, the Trustee possesses fraudulent transfer claims related to both the pledges made to Goggin and Goodwin and the specific payments made to such individuals in 2013 and 2014.

[ECF No. 231 at 187 n.91.] Goodwin and Goggin assert that Trustee's argument is insufficient to overcome their Motions.

The Court will address each of the Amended Complaint's asserted bases for Count 17 in turn, starting with recharacterization. Trustee's only recharacterization claim against Goodwin and Goggin is in Count 12, and it was dismissed with prejudice by a prior Agreed Order [ECF No. 269]. Count 12 thus cannot serve as a basis for Trustee's Count 17 constructive fraud claim.

Trustee asserts equitable subordination claims against Goodwin and Goggin in Counts 11 and 16. As discussed above in relation to Count 13, equitable subordination cannot serve as the basis for a constructive fraudulent transfer claim. *See* Section III(B)(4), *supra*. Therefore, Counts 11 and 16 cannot serve as a basis for Trustee's Count 17 constructive fraud claim.

That leaves Trustee's reference to "fraudulent transfer claims related to both the pledges made to Goodwin and Goggin and the specific payments made to such individuals in 2013 and 2014" as the only possible basis for Count 17. [ECF No. 231 at 187 n.91.] The Court infers from Trustee's overall briefing that she is referring to her fraudulent transfer claims in Counts 14 and 15. Count 14 seeks to avoid JAD Debtors' guarantees and liens relating to the 2013

55

Amended Notes as constructively fraudulent.  Count 15 seeks to avoid JAD Debtors' guarantees and liens and LR Debtors' liens relating to the 2013 Amended Notes as actually fraudulent.  The Amended Complaint does not seek to avoid U.S. Coal's obligations to Goodwin or Goggin under the 2013 Amended Notes.  Yet, Trustee states that "Goodwin and Goggin each received $645,408.58 from *U.S. Coal* between February 2013 and May 2014," and did not tie any of those transfers to JAD Debtors' or LR Debtors' funds.  [ECF No. 231 at 65 (emphasis added).]

Trustee's reliance on the potential avoidance of JAD Debtors' and LR Debtors' obligations to Goodwin and Goggin under the 2013 Amended Notes to support her claim to avoid payments that U.S. Coal made to Goodwin and Goggin on those Notes suffers from the same deficiency that the Court explained regarding Count 5 above.  *See* Section III(B)(1)(c), *supra*.  Even if Trustee prevails on Count 14 or 15 and avoids JAD Debtors' or LR Debtors' obligations to Goodwin and Goggin, that avoidance could not serve as a basis for avoiding payments to Goodwin or Goggin under Count 17 because it is undisputed that U.S. Coal—not JAD Debtors or LR Debtors—made the payments that Trustee seeks to avoid, and Trustee did not challenge U.S. Coal's obligation to Goodwin or Goggin.

For the foregoing reasons, the Court concludes that Trustee has not set forth sufficient evidence from which a fact-finder reasonably could find in her favor on Count 17.  Goodwin and Goggin are entitled to a summary judgment, and Goodwin and Goggin's Motions as to Count 17 are GRANTED.

**IV.      Claims for Avoidance of Actually Fraudulent Transfers.**

**A.      Legal Standards.**

**1.      Avoidance Under Kentucky State Law.**

Trustee seeks to avoid alleged actually fraudulent transfers or obligations incurred to

Defendants by exercising her § 544(b)(1) "strong arm" powers.  Trustee bears the burden of

proving all elements of § 544(b)(1), including that the subject transfer is voidable under

applicable state law.  *Felsner*, 289 F. App'x at 882 (quoting *Forbes*, 372 B.R. at 330).  Trustee

relies on Kentucky fraudulent conveyance law in K.R.S. § 378.010, "which prevents transfers or

conveyances 'with the intent to delay, hinder or defraud creditors.'"  *Phoenix Corp. v. Allen (In*

*re Calumet Farm, Inc.)*, 46 F. App'x 300, 303 (6th Cir. 2002) (quoting K.R.S. § 378.010).  The

applicable version of that statute provides:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real
> or personal, or right or thing in action, or any rent or profit thereof, made with the
> intent to delay, hinder or defraud creditors, purchasers or other persons, and every
> bond or other evidence of debt given, action commenced or judgment suffered, with
> like intent, shall be void as against such creditors, purchasers and other persons.
> This section shall not affect the title of a purchaser for a valuable consideration,
> unless it appears that he had notice of the fraudulent intent of his immediate grantor
> or of the fraud rendering void the title of such grantor.

K.R.S. § 378.010 (repealed Jan. 1, 2016).[22]  As of the Petition Dates, Kentucky's statute of

limitations for its actual fraudulent transfer statute was five years.  K.R.S. § 413.120(12).[23]

Thus, the "lookback period" for the conveyances at issue is five years from the transferring

Debtor's Petition Date.

---

[22] K.R.S. § 378.010 was repealed on January 1, 2016, when Kentucky adopted the Uniform Voidable Transactions
Act at K.R.S. §§ 378A.005 to .140.  Transfers "occurring prior to [the UVTA's] enactment must be considered under
the repealed chapter 378, which was in effect at the time of the pertinent transfers." *Pryor Cashman*, 565 B.R. at 798
n.3.  The transfers at issue in this case were made prior to May 22, 2014, so now-repealed K.R.S. § 378.010 applies.

[23] K.R.S. § 413.120 was amended effective June 24, 2015.

"Although fraud involves intent, proof of fraud need not include direct evidence of intent." *U.S. v. Isaac,* 968 F.2d 1216 (6th Cir. 1992) (unpublished table decision), *available at* 1992 WL 159795, at *4 (citing *Bolling v. Adams*, 296 S.W.2d 696, 699 (Ky. 1956)). "Kentucky acknowledges the difficulty of finding direct evidence of fraudulent intent," and "[t]o work around this problem, Kentucky courts have identified circumstances surrounding a conveyance that create a presumption of fraudulent intent, denominated 'badges of fraud.'" *Ky. Petroleum Operating Ltd. v. Golden, et al.*, No. 12-164-ART, 2015 WL 927358, at *4 (E.D. Ky. Mar. 4, 2015). "Badges of fraud are 'circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them.'" *Isaac*, 1992 WL 159795, at *4 (quoting *U.S. v. Leggett*, 292 F.2d 423, 426 (6th Cir. 1961)). Under Kentucky law,

> [b]adges of fraud exist when: (1) the transfer or conveyance is between persons who are related or occupy a confidential relationship; (2) where the transfer or conveyance contains false statements and recitals as to consideration; (3) where the transfer or conveyance is made by a debtor in anticipation of a suit against him or after a suit has begun or is pending against him; and (4) where the transfer or conveyance is made by a debtor who transfers all or any appreciable part of his property when he is insolvent or financially embarrassed.

*Jadco Enters., Inc. v. Fannon,* No. 6:12-225-DCR, 2013 WL 6055170, at *12 (E.D. Ky. Nov. 15, 2013) (citation omitted), *on reconsideration in part*, 991 F.Supp.2d 947 (E.D. Ky. 2014). Additional recognized badges of fraud include: "(1) inadequacy of consideration; (2) secret or hurried transactions not in the usual mode of doing business; (3) the use of dummy or fictitious parties; (4) reservation of benefits by the transferor; [and] (5) control or dominion of property by the debtor . . . ." *Liquidating Trustee of App Fuels Creditors Trust v. Energy Coal Res. (In re Appalachian Fuels, LLC)*, No. 11-1041, 2012 WL 4059909, at *2 (Bankr. E.D. Ky. Sept. 14, 2012) (citing *Montalvo*, 333 B.R. at 148-49).

## 2. Avoidance Under the Bankruptcy Code.

Trustee also seeks avoidance of alleged actually fraudulent transfers or obligations

incurred to Defendants under the Bankruptcy Code.  Section 548 provides in relevant part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the
> benefit of an insider under an employment contract) of an interest of the debtor in
> property, or any obligation (including any obligation to or for the benefit of an
> insider under an employment contract) incurred by the debtor, that was made or
> incurred on or within 2 years before the date of the filing of the petition, if the
> debtor voluntarily or involuntarily--
>
> (A) made such transfer or incurred such obligation with actual intent to hinder,
> delay, or defraud any entity to which the debtor was or became, on or after the
> date that such transfer was made or such obligation was incurred, indebted . . . .

11 U.S.C. § 548(a)(1)(A).  For Trustee to succeed on her § 548(a)(1)(A) claims, she must prove

by a preponderance of the evidence:  "(1) a transfer of an interest of the Debtor's property or the

incurring of an obligation; (2) made on or within two years of the petition date; and (3) with

actual fraudulent intent."  *Johnson*, 579 B.R. at 801 (citation omitted).

As with state law, intent to defraud under § 548(a)(1)(A) may be proven by badges of

fraud:

> lack of or inadequate consideration, family or a close relationship between the
> parties, retention of possession, benefit or use of the property in question, the
> financial condition of the party sought to be charged both before and after the
> transaction, the existence or cumulative effect of the pattern or series of transactions
> or the course of conduct after incurring of the debt and onset of financial difficulties
> or a pending or threat of lawsuits by creditors, as well as the general chronology of
> events and transactions under inquiry.

*Id.* at 801 (citing 5 COLLIER ON BANKRUPTCY ¶ 548.04[1][b][i] (Alan N. Resnick & Henry J.

Sommer eds., 16th ed. 2011)).

## 3. Review of Badges of Fraud on Summary Judgment.

"Although summary judgment is generally inappropriate when intent is at issue, summary

judgment may be granted where all reasonable inferences defeat the claims of one side."

*Sicherman v. Rivera (In re Rivera)*, 338 B.R. 318, 327 (Bankr. N.D. Ohio 2006), *aff'd*, 356 B.R. 786 (B.A.P. 6th Cir. 2007) (citations omitted).  A "[p]laintiff does not have to show clear and convincing evidence [of fraud] at [the summary judgment] stage, only evidence that could support a reasonable factfinder in their determination of fraud by the clear and convincing standard." *Jadco*, 2013 WL 6055170, at *7 (citing *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 275 (5th Cir. 1987)).  Where, as here, a defendant requests summary judgment under FED. R. CIV. P. 56 on a claim to avoid an actual fraudulent transfer:

> to avoid summary judgment, the Plaintiff[] must first demonstrate sufficient badges of fraud so that it "would be unreasonable ... to find that the transfer was not fraudulent." *Russell Cty. Feed Mill*, 520 S.W.2d at 311.  If sufficient badges of fraud are not shown, summary judgment is appropriate for the Defendants.  If sufficient badges of fraud are shown, however, summary judgment will still be appropriate if the Defendants can then show "countervailing proof ... that the transfer or conveyance was made fairly and without intent to defraud the creditor." *Id.*  If there remains a genuine dispute of a material fact after these showings have been made, summary judgment will be denied.

*CDK Global, LLC v. Scott & Reynolds, LLC*, No. 1:14-CV-00045-JHM, 2017 WL 956594, at *5 (W.D. Ky. Mar. 10, 2017) (reviewing a claim under K.R.S. § 378.010).

### B.    Application of Law.

Count 6 (ECM II), Count 9 (ECM), and Count 15 (Goodwin and Goggin) each assert actual fraudulent transfer claims under Kentucky state law and § 548(a)(1)(A).  Defendants moved for summary judgment on all counts.  Trustee did not move for summary judgment on any count.

### 1.    ECM II is entitled to a summary judgment on Count 6.

### a.    ECM II is entitled to a summary judgment on Count 6 as to JAD Debtors' and LR Debtors' guarantees and liens granted to ECM II.

Pursuant to § 544(b) and K.R.S. § 378.010, Count 6 seeks to avoid as actually fraudulent:

(a) obligations JAD Debtors incurred by guaranteeing $1,322,406.38 of the ECM II Loan;

60

(b) obligations LR Debtors incurred by guaranteeing $5,407,016.22 of the ECM II Loan; and

(c) transfers JAD Debtors and LR Debtors made by granting liens on all their assets to secure

their respective guarantees.  Under both Kentucky law and § 548(a)(1)(A), Count 6 also seeks

avoidance of payments to ECM II on the ECM II Loan totaling $776,929.68 within two years

preceding LR Debtors' and JAD Debtors' respective Petition Dates.  ECM II seeks a summary

judgment on Count 6.

The parties' arguments regarding the avoidability of JAD Debtors' and LR Debtors'

guarantees and liens do not differentiate among the transferring Debtors.  ECM II contends that it

is entitled to a summary judgment as to all Debtors' guarantees and liens because Trustee has

produced no evidence that any Debtor made those conveyances with an intent to delay, hinder, or

defraud creditors.  Instead, ECM II posits that the subject Debtors made those conveyances "for

the purpose of refinancing pre-existing debt, in an effort to secure longer-term and lower-interest

debt."  [ECF No. 190-1 at 26.]  In opposition, Trustee offers an alternative explanation.  She

asserts that "[t]he entire purpose of the transaction was to dramatically increase Goggin and

Goodwin's control over the Debtors – to 'feather the nest' so to speak and solidify the foundation

laid by the ECM Credit Agreement."  [ECF No. 231 at 132-33.]

As discussed below, Trustee has presented sufficient evidence of two badges of fraud

(anticipation of litigation and inadequate consideration), and there is no question that the

insolvency badge is disputed.  However, Trustee's arguments about the confidential relationship

badge will not be considered further at trial.  ECM II attempted to rebut Trustee's badges of

fraud with a "good faith" argument, but it failed to present countervailing evidence that neither

LR Debtors nor JAD Debtors acted with fraudulent intent.  ECM II is not entitled to summary

judgment on this portion of Count 6.

### i.    Trustee's Argument Regarding Direct Evidence.

Trustee's opposition focuses on Goodwin and Goggin's actions regarding the ECM II Loan. As "direct evidence of fraudulent intent," Trustee cites an email from Goggin indicating that "the ECM II transaction would allow ECM and ECM II to, 'between the two [debt] facilities, . . . effectively own the two operating businesses that are U.S. Coal as our last line of defense.'" [ECF No. 231 at 132, 133 (quoting ECF No. 232-5 at 1).] Trustee also cites Collins' testimony that Goodwin and Goggin knew Debtors needed the ECM II Loan to avoid default and bankruptcy and would consider a high interest rate. [*Id.* at 133 (citing 2016 Collins Dep. (ECF No. 232-1 at 47).] Based thereon, Trustee argues that "[t]he inescapable conclusion is that Goggin and Goodwin – and their corporate vehicles ECM and ECM II – used their insider information and significant leverage to cause the Debtors to reject the favorable Macquarie deal in favor of the highly unfavorable ECM II deal, and did so for their own gain at the expense of the Debtors." [*Id.* at 133.]

That portion of Trustee's argument misses the mark. To prevail on Count 6, Trustee must identify evidence that JAD Debtors and LR Debtors, not Goodwin and Goggin, acted with fraudulent intent. Even assuming Trustee's conclusion about Goodwin and Goggin's actions is accurate, which they vehemently dispute, Trustee fails to explain how their personal intentions, or those of ECM or ECM II, evidence the transferring Debtors' intent.

### ii.    The Parties' Arguments Regarding Badges of Fraud.

Trustee also contends that multiple badges of fraud surround the ECM II transaction: (a) a transfer of appreciable portion of assets while insolvent; (b) a confidential relationship; (c) a conveyance made in anticipation of litigation; and (d) inadequate consideration.

**(A)    Transfer of Appreciable Assets While Insolvent.**

ECM II acknowledges that there may be a genuine dispute over LR Debtors' and JAD

Debtors' solvency, and the Court finds that there is.  Therefore, this badge requires a trial.

Because JAD Debtors and LR Debtors granted liens on all their assets to secure the ECM II

Loan, there can be no genuine dispute that they conveyed an appreciable portion of their assets.

**(B)    Confidential Relationship.**

While Kentucky law recognizes a "confidential relationship" as a badge of fraud under

K.R.S. § 378.010, existing case law does not dissect the meaning of that phrase except where

familial relations are present.  However, discussions of confidential relationships in other

contexts are instructive.  In a fraudulent conveyance decision prior to the enactment of K.R.S.

§ 378.010, Kentucky's highest court explained:

> Ordinarily equity will only invoke the doctrine of confidential relationship where
> the parties sustain the relation either of trustee and cestui que trust, guardian and
> ward, attorney and client, parent and child, husband and wife, principal and agent,
> master and servant, and physician and patient, yet it will be imposed where none
> of those relationships exist if the facts justify the assumption that the transaction
> was had under such conditions that one of the parties may be said to have
> exercised dominion over the other.

*Hitchcock v. Tackett*, 272 S.W. 52, 54 (Ky. 1925).

In a recent fiduciary duty case, the Sixth Circuit recognized that a "confidential

relationship" under Kentucky law is one in which "one party 'repos[es]' a certain degree of trust

and confidence in' the other."  *Osborn v. Griffin*, 865 F.3d 417, 445 (6th Cir. 2017) (quoting

*Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 486 (Ky. 1991)).  Similarly, a

"confidential relationship" exists "in all cases where there has been a special confidence reposed

in one who in equity and good conscience is bound to act in good faith and with due regard to the

interests of the one reposing confidence."  *Fed. Ins. Co. v. Woods (In re Woods)*, 558 B.R. 164,

170 (Bankr. W.D. Ky. 2016) (in statute of limitations dispute, quoting *Sec. Tr. Co. v. Wilson*, 210

S.W.2d 336, 338 (Ky. 1948)).

Trustee's argument again focuses entirely on Goodwin and Goggin, referring to their

membership on U.S. Coal's Board, stakes in Debtors' primary debtholder (ECM), and stakes in

Debtors' new debtholder (ECM II) at the time of the ECM II Loan transaction.  Without

elaboration, she concludes that these roles gave Goodwin and Goggin "control over the Debtors,

ECM, and ECM II [which] is more than sufficient to establish the 'confidential relationship'

between the Debtors and ECM II."  [ECF No. 231 at 134.]  Though she acknowledges Goodwin

and Goggin's "alleged 'recusal'" from the Board vote to approve the ECM II transaction, Trustee

contends that consideration of the recusal "ignores everything Goggin and Goodwin did before

the vote to ensure that the Debtors would have no choice but to accept ECM II's offer."  [*Id.* at

135.]  Namely, "[a]t the same time Goggin and Goodwin killed the Macquarie transaction, they

immediately set about to create ECM II as the last resort for saving the Debtors from default,

collection actions, and bankruptcy."  [*Id.*]

The flaw in Trustee's argument is that neither Goodwin nor Goggin were parties to the

ECM II transaction.  The confidential relationship badge analyzes the relationship between the

transferors (here, JAD Debtors and LR Debtors – not U.S. Coal) and the transferee (ECM II).  At

the time of the ECM II transaction, there was no relationship between the subsidiary Debtors and

ECM II, confidential or otherwise.  To find a relationship would require ignoring multiple

corporate veils by imputing Goggin and Goodwin's intentions to ECM II, on one side, and to

U.S. Coal on the other, and then going a step further to impute U.S. Coal's intentions to JAD

Debtors and LR Debtors.  No facts or law support that imputation.  Therefore, Trustee may not

present evidence of this badge to support her Count 6 claim at trial.

### (C)    Anticipation of Litigation.

In support of the "anticipation of litigation" badge, Trustee relies on the undisputed fact that Debtors entered the ECM II Loan at a time when the CAM Entities were demanding payment and threatening collection action.  Trustee highlights that the CAM JAD Bridge Notes and CAM Equipment Note were due to mature on December 31, 2011, and the CAM Entities' "put rights" to require U.S. Coal to purchase the Entities' shares of U.S. Coal common stock had matured, but Debtors did not have funds to pay them.  ECM II does not dispute those facts, but it contends that Debtors' partial use of the ECM II Loan funds to pay the CAM JAD Bridge Notes negates Trustee's argument.  To ECM II, "[i]nterpreting this factor in a manner that precludes a debtor from securing a loan used to pay the very creditor who is alleged to be threatening litigation would not serve the purpose of Kentucky fraudulent transfer law."  [ECF No. 238 at 8 (emphasis removed).]

Trustee notes that the CAM Entities retained significant unpaid claims after the ECM II Loan transaction, and she argues that ECM II incorrectly states the law.  Under Trustee's interpretation, she "need merely show that the transfer at issue was made under the threat of litigation, which she has done," and "[t]he transferee is irrelevant."  [ECF No. 231 at 136.] Trustee's logic ignores the general premise behind actual fraudulent transfer avoidance statutes: to rectify a situation in which a debtor puts his property beyond a creditor's reach.  *See, e.g., Harris v. Nat'l Inv. & Fin. Co., Inc. (In re Akin)*, 64 B.R. 510, 515 (Bankr. W.D. Ky. 1986) (finding an actual fraudulent transfer under K.R.S. § 378.010 where "the purpose and effect of the transfer . . . was to place . . . assets beyond the reach of existing unsecured creditors to their detriment."); *Pope v. Cawood*, 170 S.W.2d 55, 57 (Ky. 1943) (recognizing that actual fraud involves "an effort on the part of the grantor to put his property beyond the reach of a creditor").

Trustee presented no evidence that Debtors intended to shield their assets from the CAM Entities' potential future litigation or collection efforts by pledging them to ECM II.

Yet, although a close call, the Court finds that Trustee adequately identified evidence from which a reasonable factfinder could conclude that JAD Debtors' and LR Debtors' transfers relating to the ECM II Loan were made in anticipation of litigation by the CAM Entities.  While it is undisputed that the CAM Entities received a portion of the ECM II Loan proceeds, this, without more, is insufficient to preclude this badge.  Trustee may present evidence of this badge to support her Count 6 claim at trial.

### (D)    Inadequate Consideration.

As discussed regarding Count 5, Trustee is entitled to summary judgment that LR Debtors did not receive "valuable consideration" in exchange for their guarantees and pledges to ECM II, and that is sufficient to demonstrate the "inadequacy of consideration" badge under Count 6.  As for JAD Debtors, it is undisputed that they became obligated on $6.7 million of secured debt to replace $5.4 million in unsecured debt via the ECM II Loan.  Given that significant discrepancy, and the specific issues previously discussed regarding JAD Debtors under Count 5, Trustee presented sufficient evidence supporting this badge as to JAD Debtors under Count 6.[24]  Trustee may present evidence of this badge to support her Count 6 claim at trial.

In review, Trustee has set forth specific facts showing that there are genuine issues for trial regarding JAD Debtors' and LR Debtors' intent as to the guarantees and liens they granted ECM II in the ECM II Loan transaction.  The "inadequate consideration" and "anticipation of

---

[24] For absence of doubt, this is not a determination as to whether JAD Debtors received "valuable consideration" as a matter of law under K.R.S. § 378.020, which will be decided under Count 5 at trial.

litigation" badges of fraud are present, and the "transfer of appreciable assets while insolvent"

badge is genuinely disputed.  But, that does not end the analysis.

### iii.    ECM II's Argument that, Despite the Presence of Badges of Fraud, Countervailing Proof Exists that Debtors Made the Transfers Without Intent to Defraud.

ECM II argues that even if sufficient badges of fraud are present, it is still entitled to a

summary judgment because it is undisputed that the subject Debtors entered into the ECM II

Loan transaction in good faith and with no intent to defraud.  Specifically, ECM II asserts that:

(a) Debtors entered into the ECM II Loan transaction for the legitimate purpose of refinancing

the CAM JAD Bridge Notes and the 2008 Bridge Notes, and the Loan funds were used for that

purpose; (b) Debtors negotiated the ECM II Loan in good faith through Windisch and Collins;

(c) meeting minutes indicate that the ECM II Loan was formally approved by a disinterested

U.S. Coal Board at its November 23, 2011 special meeting; and (d) Windisch's testimony

evidences that Debtors believed the ECM II Loan to be as positive result for Debtors.

ECM II relies heavily on the minutes from the November 23, 2011 special meeting of

U.S. Coal's Board during which the ECM II Loan transaction was approved.  ECM II highlights

that the minutes reflect that:  (a) U.S. Coal's Board members, officers, and legal counsel were

present; (b) the meeting's purpose was to discuss maturity-date extensions and refinancing

through loans from ECM II; (c) Windisch discussed "the business purpose of the extensions of

the existing debt and explained how it would benefit the Company and the subsidiaries";

(d) Goggin and Goodwin recused themselves, and the remaining Board members discussed the

transaction; (e) the Board concluded that, despite the conflict, the ECM II Loan transaction was

fair to the Debtors and in their best interests; and (f) the Board resolved that Debtors would enter

into the ECM II transaction.  [ECF No. 238, p. 12 (quoting Nov. 23, 2011 Board Minutes (ECF

No. 195-18).]  Trustee did not discuss or dispute the contents of the minutes.

The Court has already determined that "a material dispute of fact exists regarding

whether voting members of the Board were sufficiently informed of the terms of the [ECM II

Loan] deal before voting to approve it."  *Licking River Mining*, 2019 WL 1430213, at *19.  The

evidence ECM II cites to support its argument that Debtors entered the ECM II Loan transaction

in good faith further illustrates the presence of a material fact dispute regarding the

circumstances yielding the ECM II Loan.  ECM II therefore is not entitled to a summary

judgment on Count 6 to the extent it seeks avoidance of JAD Debtors' and LR Debtors'

guarantees and liens.

> **b.      ECM II is entitled to a summary judgment on Count 6 as to payments made to ECM II.**

ECM II also requested a summary judgment as to payments ECM II received on the

ECM II Loan.  Trustee avers in the Amended Complaint that LR Debtors' assets were used to

make payments to ECM II on the portion of the ECM II Loan that was used to pay the CAM

JAD Bridge Notes, which LR Debtors did not owe.  She contends that, because ECM II does not

have valid liens and claims against LR Debtors for that portion of the ECM II Loan, any use of

LR Debtors' assets to pay ECM II on that portion is a fraudulent transfer recoverable from ECM

II.  Trustee makes the same assertions to the extent that JAD Debtors' assets were used to make

payments to ECM II on the portion of the ECM II Loan that was used to pay the 2008 Bridge

Notes, which JAD Debtors did not owe.

This is the same argument Trustee asserted to avoid these payments as constructively

fraudulent in Count 5.  For the reasons discussed in Section III(B)(1)(c), *supra*, ECM II is

entitled to a summary judgment on Count 6 to the extent it seeks avoidance of payments to ECM

II.  It is undisputed that U.S. Coal made all payments that Trustee seeks to avoid pursuant to its

debt obligation to ECM II under the ECM II Loan, and Trustee did not challenge U.S. Coal's

obligation to ECM II as a fraudulent transfer.

### c.      Conclusions as to Count 6.

For the foregoing reasons, ECM II's Motion as to Count 6 is GRANTED to the extent it

seeks a summary judgment on Trustee's claim to avoid payments to ECM II.  ECM II's Motion

is DENIED to the extent it seeks a summary judgment on Trustee's claim to avoid LR Debtors'

and JAD Debtors' guarantees and liens in Count 6.

### 2.      ECM is not entitled to a summary judgment on Count 9, regarding the USCM transaction.

Claiming actual fraud pursuant to § 544(b) and K.R.S. § 378.010, Count 9 seeks to avoid

the $800,000 payment that U.S. Coal made to USCM on September 30, 2009, and to recover the

avoided transfer from ECM under § 550(a)(1) as the party for whose benefit the transfer was

made.[25]  Count 9 also seeks avoidance and recovery of U.S. Coal's payments to ECM totaling

$99,846.98 during the two years preceding its Petition Date as actually fraudulent under both

Kentucky law and § 548(a)(1)(A).  ECM seeks summary judgment.

As discussed earlier, ECM asserts that U.S. Coal made the $800,000 payment to USCM

either to fulfill bonus obligations to certain employees or incentivize them to remain in U.S.

Coal's employ.  ECM contends that either purpose was proper and that Trustee has produced no

evidence that U.S. Coal made the transfer with actual intent to delay, hinder, or defraud its

---

[25] Citing §§ 550(b)(1) and (2), ECM initially argued in its Motion that:  (a) Trustee cannot recover any avoided
transfer from ECM under Count 8 because USCM—not ECM—was the initial transferee, and USCM took the
payment from USCM for value, in good faith, and without knowledge of the payment's avoidability; or (b) even if
USCM did not take the payment in that manner, Trustee cannot recover from ECM because ECM took the payment
from USCM in that manner.  Trustee responded that the "good faith transferee" defense under § 550(b) does not
apply to a claim under § 550(a)(1) to recover an avoided transfer from "the entity for whose benefit such transfer
was made," which is what Trustee claims in Count 8.  ECM did not dispute or otherwise address Trustee's argument
in its Reply.  The Court thus treats ECM's argument on this point as withdrawn.

creditors.  In opposition, Trustee argues that U.S. Coal made the transfer for the improper

purpose of favoring ECM's interests, not as part of any employee compensation, and that its

intention in doing so was to defraud other creditors.  She contends that multiple badges of fraud

surround the USCM transaction:  (a) a transfer of appreciable property while insolvent; (b) a

transfer between related parties; (c) inadequate consideration; and (d) false statements of

consideration.

### a.        Transfer of Appreciable Assets While Insolvent.

The parties submitted competing expert reports on solvency issues, and ECM concedes

that Debtors' solvency is disputed.  This dispute directly bears on whether the $800,000 was an

appreciable part of U.S. Coal's assets.  Therefore, this badge requires a trial.

### b.        Confidential Relationship.

ECM contends that U.S. Coal's transfer was not between related parties or those in a

confidential relationship because ECM was not a shareholder or creditor of U.S. Coal at the

transfer date.  In opposition, Trustee asserts that U.S. Coal's transfer was indisputably a transfer

between related parties because USCM was owned by eight members of U.S. Coal's

management, two of whom served on its Board.  Also, the Board members in attendance at the

meeting during which U.S. Coal's Board retroactively approved the transfer all either benefitted

from the transfer because they owned or represented an interest in ECM (Goggin, Goodwin, and

Koutsodimitropoulos) or received an economic interest in ECM via USCM (Robert Gabbard and

John Whitt).

"[W]hile conveyances between companies with common members are 'not the

quintessential confidential relationship[,]' the relatedness of the two entities should still be

considered."  *Sierra Enters, Inc. v. SWO & ISM, LLC*, 264 F.Supp.3d 826, 847 (W.D. Ky. 2017)

(quoting *CDK Global*, 2017 WL 956594, at *7).  ECM incorrectly analyzed this badge of fraud

as if the transfer was between U.S. Coal and ECM, rather than U.S. Coal and USCM.  It is undisputed that eight members of U.S. Coal's management owned USCM.  Two of those people, Gabbard and Whitt, were members of U.S. Coal's Board at that time.  All of eight of those people benefitted from the transfer because U.S. Coal's payment allowed them to receive interests in USCM, and several of them testified that they were aware the transfer was being made for their benefit.  That is undisputed.  U.S. Coal's $800,000 transfer to USCM was between parties who are sufficiently related to demonstrate this badge of fraud.  Therefore, Trustee may present evidence of this badge to support her Count 9 claim at trial.

### c.      Inadequate Consideration and False Statements of Consideration.

As discussed in relation to Count 8, there is a genuine dispute of material fact over what consideration, if any, U.S. Coal received in exchange for the $800,000 transfer and what impact, if any, the RCI Agreements have on that issue.  The parties did not present additional argument regarding Count 9 beyond that asserted as to Count 8.  For the same reasons discussed as to Count 8, genuine issues of material fact surround the "inadequacy of consideration" and "false statements of consideration" badges as to Count 9.  Therefore, these badges require a trial.

### d.      Conclusions as to Count 9.

In sum, Trustee has set forth sufficient facts showing that there are triable issues as to U.S. Coal's intent regarding the $800,000 transfer to USCM.  ECM did not argue that there is countervailing proof that the transfer was made fairly.  ECM therefore is not entitled to summary judgment on Count 9 to the extent it seeks avoidance of the $800,000 transfer.

Count 9 also contemplates avoidance of U.S. Coal's payments to ECM during the two years preceding its Petition Date as fraudulent transfers.  That claim is predicated upon the avoidance of the $800,000 transfer that enabled USCM to own the interest in ECM.  Because

71

ECM is not entitled to summary judgment on the $800,000 transfer, it likewise is not entitled to summary judgment as to the transfers totaling $99,846.98.

ECM's Motion as to Count 9 is DENIED.

> **3.    Goodwin and Goggin are not entitled to a summary judgment on Count 15 regarding JAD Debtors' guarantees and JAD Debtors' and LR Debtors' liens relating to the 2013 Amended Notes.**

Pursuant to both Kentucky law and § 548(a)(1)(A), Count 15 seeks to avoid as actually fraudulent:  (a) obligations JAD Debtors incurred by guaranteeing U.S. Coal's 2013 Amended Notes for $1,097,620.03 to each of Goodwin and Goggin; and (b) transfers JAD Debtors and LR Debtors made by granting liens to Goodwin and Goggin on all their assets to secure the 2013 Amended Notes.  Goodwin and Goggin both seek summary judgment on Count 15.

Goodwin and Goggin contend that Debtors made their conveyances to extend and obtain more favorable terms on valid, pre-existing debts.  In opposition, Trustee argues that Debtors did so "to appease Goggin and Goodwin by putting them higher in the capital structure of the Debtors (through liens and guarantees), so that they could be paid before other creditors."  [ECF No. 231 at 191.]  Trustee asserts that multiple badges of fraud surround the 2013 Amended Note transaction:  (a) transfer of appreciable property while insolvent; (b) transfers between parties in a confidential relationship; and (c) inadequate consideration.

> **a.    Transfer of Appreciable Assets While Insolvent.**

Both Goodwin and Goggin acknowledge that there may be a factual dispute regarding whether Debtors were insolvent at the time of the 2013 Amended Note transaction, and the Court finds that there is.  Therefore, this badge requires a trial.  Because both LR Debtors and JAD Debtors granted all-asset liens to secure the 2013 Amended Notes, there can be no genuine dispute that they conveyed an appreciable portion of their assets.

### b.      Confidential Relationship.

As to the "confidential relationship" badge, it is undisputed that Goggin was a U.S. Coal Board member at the time of the 2013 Amended Notes transaction and, in that capacity, he owed fiduciary duties to U.S. Coal.  Although Goggin was not a board member of any other Debtor, it is undisputed that U.S. Coal's Board and management made significant financial decisions for the entire corporate family.  While the parties disagree about the level of Goggin's involvement in negotiations that yielded the 2013 Amended Notes, the Trustee has identified sufficient evidence of the confidential relationship badge as to Goggin.  Trustee may present evidence of this badge to support her Count 15 claim against Goggin at trial.

Goodwin was also a U.S. Coal Board member, but he resigned before negotiating the 2013 Amended Notes.  Trustee references that Goodwin was a significant U.S. Coal shareholder and an owner of ECM, which also was a significant U.S. Coal shareholder and creditor.  She contends that this evidences a confidential relationship that "allowed Goggin and Goodwin to extract the concessions they obtained in the Note Conversion."  [ECF No. 231 at 191.]  However, Trustee cites no evidence or law indicating that any role Goodwin had with U.S. Coal and ECM at the time of the 2013 Amended Notes transaction demonstrates a "confidential relationship" between Goodwin and JAD Debtors or LR Debtors.  Therefore, Trustee may not present evidence of this badge to support her Count 15 claim against Goodwin at trial.

### c.      Inadequate Consideration.

Trustee has presented sufficient evidence of the "inadequate consideration" badge of fraud as to JAD Debtors and LR Debtors.  As discussed regarding Count 14, Trustee contends that JAD Debtors received no consideration for their guarantees and pledges.  In support, she points to the $2 million increase in JAD Debtors' liabilities because of their guarantees of the

2013 Amended Notes, for which they had no prior obligation, and their grants of blanket liens to secure those debts.  As for LR Debtors, Trustee contends that they received nothing of value in exchange for the all-asset liens they pledged to secure the 2013 Amended Notes, which had been unsecured loans from the inception of their predecessor debts in the 2008 Bridge Notes (as previously amended and restated) until the 2013 transaction.  While Goodwin and Goggin contend that JAD Debtors and LR Debtors received certain indirect benefits in exchange for those conveyances, for the same reasons discussed regarding Count 14, they did not identify sufficient evidence to defeat the inadequate consideration badge.[26]  Therefore, Trustee may present evidence of this badge at trial.

### d.    Conclusion as to Count 15.

The foregoing demonstrates that Trustee adduced evidence that genuine issues of material fact require a trial concerning JAD Debtors' and LR Debtors' intent regarding the obligations they incurred and transfers they made in the 2013 Amended Notes transaction. Goodwin and Goggin did not argue that there is countervailing proof that those obligations were incurred and transfers were made fairly.[27]  Goodwin and Goggin therefore are not entitled to a summary judgment, and their Motions as to Count 15 are DENIED.

---

[26] For absence of doubt, this is not a determination as to whether JAD Debtors received "valuable consideration" under K.R.S. § 378.020 or "reasonably equivalent value" under 11 U.S.C. § 548(a)(1)(B) as a matter of law, which will be decided under Count 14 at trial.

[27] Goodwin and Goggin presented one additional argument regarding Count 15 that is discussed and dismissed above regarding Count 14.  Goodwin and Goggin contend that they are entitled to a summary judgment on Counts 14 and 15 because Trustee cannot show damage to the estates from any pledge of assets to Goodwin or Goggin in exchange for refinancing and extending the 2008 Bridge Notes.  In support, Goodwin and Goggin cited four cases that are neither binding nor persuasive, and the Court rejected their applicability to Count 14 in Section III(B)(5), *supra*.  For the same reasons, the Court again rejects their applicability to Count 15.

**V.**     **Count 18 Asserting Claim for Avoidance of Preferential Transfer.**

Within the year preceding its Petition Date, U.S. Coal transferred $470,408.58 each to

Goodwin and Goggin in periodic payments on the 2013 Amended Notes.  Of this amount,

$104,535.24 was paid to each within the 90 days preceding the Petition Date (the "90-Day

Transfers"; the remaining transfers within one year of the Petition Date are referred to as the

"Insider Transfers").  Count 18 seeks to avoid and recover these transfers as preferences pursuant

to § 547(b).

Trustee moved for summary judgment on Count 18 in full, and Goodwin and Goggin

objected.  In addition, Goodwin moved for a partial summary judgment, claiming that Trustee

may not avoid the Insider Transfers made to him because he was not an insider of U.S. Coal

during the year before U.S. Coal's bankruptcy.[28]  Goodwin's Motion is addressed first.

**A.**     **Legal Standard.**

Section 547(b) provides:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may
avoid any transfer of an interest of the debtor in property--

  (1) to or for the benefit of a creditor;
  (2) for or on account of an antecedent debt owed by the debtor before such
  transfer was made;
  (3) made while the debtor was insolvent;
  (4) made--
      (A) on or within 90 days before the date of the filing of the petition; or
      (B) between ninety days and one year before the date of the filing of the
      petition, if such creditor at the time of such transfer was an insider; and
  (5) that enables such creditor to receive more than such creditor would receive
  if--
      (A) the case were a case under chapter 7 of this title;
      (B) the transfer had not been made; and

---

[28] Goggin has not moved for summary judgment.  As noted above, he was a U.S. Coal director for more than four
years, until February 3, 2014, and thus is an "insider" for all Transfers at issue in this Count.  11 U.S.C.
§ 101(31)(B)(i).

(C) such creditor received payment of such debt to the extent provided by
the provisions of this title.

11 U.S.C. § 547(b).

Trustee asserts Goodwin is an "insider" under § 547(b)(4)(B) because he is an "insider"
of an "affiliate." Section 101(31)(E) defines "insider" as including an "affiliate, or insider of an
affiliate as if such affiliate were the debtor." 11 U.S.C. § 101(31)(E). "Affiliate" means an
"[e]ntity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or
more of the outstanding voting securities of the debtor, other than an entity that holds such
securities . . . ." 11 U.S.C. § 101(2)(A).

### B.   Goodwin is entitled to summary judgment on the Insider Transfers under Count 18.

Trustee claims Goodwin is an insider because (i) both ECM and USC Consolidated
Purchase Group LLC ("USCCPG") are affiliates of U.S. Coal; and (ii) Goodwin is an insider of
ECM and/or USCCPG. A finding for Goodwin on either contention entitles Goodwin to a
summary judgment on the Insider Transfers.

Trustee has produced no evidence that Goodwin is an insider of USCCPG, a Delaware
limited liability company. Trustee contends that because Goodwin owned a 25.86% membership
interest in USCCPG at the time of the Insider Transfers, he is a person in control of the LLC
within the meaning of § 101(31)(B)(iii). This contention lacks merit. USCCPG's Operating
Agreement confirms that Goodwin's interest was not one of control or governance. At all
relevant times, Goodwin owned only a minority interest in the LLC, and decisions were to be
made either by a majority of the LLC interests or by the entity's managing member,
Goggin. [ECF No. 197-29 ("Operating Agreement"), Articles 5.1, 3.2.] "[I]n referencing a
director, Section 101(31)(B) was intended to refer to the party that "managed" the debtor

76

corporation." *Longview Aluminum, L.L.C. v. Brandt*, 431 B.R. 193, 197 (N.D. Ill. 2010) (citing

11 U.S.C. § 101(31)(B)). "With respect to a limited liability corporation, Delaware law states

that '[u]nless otherwise provided in a limited liability company agreement, the management of a

limited liability company shall be vested in its members . . . ." *Id.* (quoting 6 Del.C. § 18–402).

Similarly, ECM is also a Delaware limited liability company. It is not disputed that

Goodwin only owned a 10.69% interest in ECM and that Goodwin was not ECM's manager.

Based on the undisputed facts, Goodwin is not an "insider" of USCCPG or ECM under

§ 101(31)(B). It is thus unnecessary to analyze whether USCCPG is an affiliate of U.S. Coal

within the meaning of § 101(2). Goodwin's Motion as to the Insider Transfers is GRANTED.

### C.    The Trustee is not entitled to summary judgment on Count 18.

Trustee's motion combines two preference claims against Goodwin and Goggin: a claim

for the 90-Day Transfers and a claim for the Insider Transfers (now dismissed as to Goodwin).

### 1.    The 90-Day Transfers.

Goodwin and Goggin each admittedly received $104,535.24 within 90 days of U.S.

Coal's Petition Date. U.S. Coal made each transfer from its bank account to creditors Goggin

and Goodwin for payments on their 2013 Amended Notes. Goodwin and Goggin do not dispute

that Trustee satisfies the elements in § 547(b)(1)-(2), (4)(A). Both Defendants contend there are

disputed issues of material fact as to solvency under § 547(b)(3) and the hypothetical chapter 7

case distribution under § 547(b)(5). They also rely on the ordinary course of business exception

to avoidance in § 547(c)(2).

### a.    Solvency - §§ 547(b)(3) and (g).

To prevail, Trustee must show that the Transfers were made while the transferring

Debtor, U.S. Coal, was insolvent. 11 U.S.C. § 547(b)(3). "[T]he debtor is presumed to have

been insolvent on and during the 90 days immediately preceding the date of the filing of the

petition." 11 U.S.C. § 547(f).  "In the absence of any evidence to the contrary, the presumption

of insolvency establishes that the debtor was insolvent at the time of the transfer."  *Williams v.*

*McNabb (In re McNabb)*, 567 B.R. 326, 338 (Bankr. W.D. Tenn. 2017) (citation omitted); *see*

*also Bluegrass Ford-Mercury, Inc. v. Farmers Nat'l Bank*, 942 F.2d 381, 390 (6th Cir. 1991) (to

avoid a finding of insolvency, the defendant "was required to present evidence to rebut this

presumption").

Under § 101(32), "[a] corporate debtor is insolvent when its 'financial condition [is] such

that the sum of [its] debts is greater than all of [its] property, at a fair valuation . . . ."  *In re*

*Lamar Haddox Contractor*, 40 F.3d 118, 121 (5th Cir. 1994) (quoting 11 U.S.C. § 101(32)).

Section 101(32) "provides the Court with a 'balance sheet' test to determine insolvency."

*McNabb* at 338 (quoting *In re Perry*, 158 B.R. 694, 697 (Bankr. N.D. Ohio 1993)).  Under the

"balance sheet" test, "a Debtor is said to be insolvent when its liabilities exceed its assets or, in

other words, when its debts are greater than its assets."  *Perry*, 158 B.R. at 697.  In comparing a

debtor's assets to his liabilities, a court must exclude property that is exempted from the

bankruptcy estate or property that was fraudulently transferred.  11 U.S.C. § 101(32)(A); *Babiker*

*v. Citizens Contracting Co.* (*In re Babiker*), 180 B.R. 458, 461 (Bankr. E.D. Va. 1995) (citing 11

U.S.C. § 101(32)(A)(ii)).  "The determination of insolvency is to be made at the time when the

alleged preferential transfer occurred and not when the petition was filed."  *McNabb* at 338

(quoting *Roeder v. Alleman* (*In re Davis*), 120 B.R. 823, 825 (Bankr. W.D. Pa. 1990)).

Trustee relies on both the § 547(f) presumption of insolvency as well her expert's report

to support her insolvency claim.  Goodwin and Goggin counter, relying on Defendants' expert

report with opinions that Debtors were balance sheet solvent on all dates except March 4 and

May 2, 2014.  They contend that conflicting expert reports, differing in results, facts and

methodology, establish that solvency is a disputed material fact on this element.  *See*, *e.g.*,

*Armstrong Coal Co. Inc. v. Blackburn*, No. 4:12CV-89-JHM, 2014 WL 4364625, at *3 (W.D.

Ky. Sept. 3, 2014) (denying motion for summary judgment owing to material dispute of fact

arising from conflicting expert opinions).  The Court agrees, with one caveat.  Defendants' report

states that U.S. Coal was balance sheet insolvent on the date of the last transfers to Defendants,

May 2, 2014.  Thus, Goodwin and Goggin failed to identify a material dispute of fact regarding

U.S. Coal's insolvency as it pertains to the transfers made to them on that date.

### b.  Hypothetical Chapter 7 Case - § 547(b)(5).

Section 547(b)(5) "permits avoidance by a trustee of a transfer that enables a creditor to

receive more than it would receive if the case were a Chapter 7 case and the transfer had not

been made."  *In re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458, 464 (6th Cir.

1991).  This section "require[s] the bankruptcy court to construct a 'hypothetical Chapter 7 case;'

*i.e.*, to determine what the creditor would have received in a liquidation."  *Id*.  The "hypothetical

chapter 7 case" is constructed based on the petition's filing date.  *McNabb*, 567 B.R. at 340

(citing *Neuger v. U.S. (In re Tenna Corp.)*, 801 F.2d 819, 822-23 (6th Cir. 1986)).

"[U]nless the estate is sufficient to provide a 100% distribution, any unsecured creditor

. . . who receives a payment during the preference period is in a position to receive more than it

would have received under a Chapter 7 liquidation."  *Chattanooga Wholesale*, 930 F.2d at

465.  Accordingly, whether the transferee creditor is secured is material to a § 547(b)(5)

analysis.

> Under the Bankruptcy Code, creditors maintaining a secured interest in property
> of the estate are, in the absence of the interest being avoided or disallowed,
> entitled to receive consideration equal to the value of their collateral or to recover
> their collateral. *See* 11 U.S.C. § 506; § 725. As a result, prepetition payments

made on account of a secured claim will normally only provide the creditor with
consideration to which it was otherwise entitled to receive in a Chapter 7, thus
negating the preferential aspect of the transfer for purposes of § 547(b)(5). *In re
Southern Air Transport, Inc.*, 511 F.3d 526, 534 (6th Cir. 2007).

*Yoppolo v. Comerica Bank (In re Norwalk Furniture Corp.)*, 428 B.R. 419, 425 (Bankr. N.D.

Ohio 2009).

Goodwin and Goggin contend that Trustee cannot satisfy the § 547(b)(5) element of this

claim at the summary judgment stage for two reasons.  First, they argue that they are secured

creditors because, even though U.S. Coal owned no equipment or property (which was the

security for the 2013 Amended Notes), U.S. Coal was the parent entity of the other Debtors that

owned these assets.  Second, they assert that U.S. Coal's schedules reflect that its interests in its

subsidiaries were worth over $56 million as of the petition date, and that the subsidiaries'

interests in equipment was valued at almost $50 million 18 months before the petition date; thus,

they argue, Trustee cannot show that no genuine dispute of material fact exists with respect to

the value of U.S. Coal's assets in a hypothetical liquidation analysis.  Both contentions lack

merit.

First, Goodwin and Goggin do not offer authority to support their position that, because

U.S. Coal's subsidiaries held the equipment and real property securing U.S. Coal's obligation,

Goodwin and Goggin should be viewed as secured creditors of U.S. Coal.  U.S. Coal has an

existence separate from its subsidiaries.  While Goodwin and Goggin may have been secured

creditors of U.S. Coal's subsidiaries, they were not secured creditors of U.S. Coal itself.

Second, Defendants make assertions about the value of the equipment and real estate

assets held by U.S. Coal's subsidiaries without recognition of their substantial liabilities.

Defendants' expert has opined that, as of May 2, 2014, U.S. Coal and its affiliates were balance-

sheet insolvent by over $21 million.  [ECF No. 227-1 at 11.]  As of the same date, Defendants'

expert also opined that U.S. Coal and its affiliates also failed the "cash flow test" and the

"adequate capital" test.  [*Id*.]  Defendants' expert did not opine that, at any point between May 2

and June 10, 2014 (U.S. Coal's Petition Date), U.S. Coal and its subsidiaries were solvent.

Conversely, based on evidence in the record, Trustee has established that U.S. Coal's estate was

not sufficient to provide a 100% distribution to creditors as of its Petition Date.  Therefore, no

genuine dispute of material fact exists as to this element of the § 547(b) test.

### c.    Ordinary Course of Business Defense.

As an affirmative defense to this claim, Goodwin and Goggin contend that Trustee cannot

recover preferential payments because they were transfers U.S. Coal made in the ordinary course

of business.  A trustee may not avoid a transfer

> to the extent that such transfer was in payment of a debt incurred by the debtor in
> the ordinary course of business or financial affairs of the debtor and the
> transferee, and such transfer was -- (A) made in the ordinary course of business or
> financial affairs of the debtor and the transferee; or (B) made according to
> ordinary business terms[.]

11 U.S.C. § 547(c)(2).  "Prior to enactment of the Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005 ('BAPCPA'), § 547(c)(2) was written in the conjunctive and required the

defendant to prove both the subjective and objective prong of the exception."  *McNabb*, 567

B.R. at 344.  As part of the BAPCPA amendments, Congress replaced "the 'and' between

subsections (A) and (B) with 'or.'  As such, a defendant is now only required to prove one of the

two prongs."  *Id*.  Section 547(c)(2)(A) involves a subjective inquiry, while § 547(c)(2)(B)

involves an objective inquiry.  *Id*. at 343.  "The subjective prong ... requires proof that the debt

and its payment are ordinary in relation to other business dealings between that creditor and that

debtor.  The objective prong ... requires proof that the payment is ordinary in relation to the

standards prevailing in the relevant industry."  *Id*. (quoting *Logan v. Basic Distrib. Corp. (In re*

*Fred Hawes Org., Inc.)*, 957 F.2d 239, 244 (6th Cir. 1992)). Defendants assert arguments

concerning both prongs of this test.

Section 547(c)(2) "was intended to 'protect recurring, customary credit transactions

which are incurred and paid in the ordinary course of business of the Debtor and the transferee.'"

*Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir. 1989)

(citation omitted). Based on the evidence in the record, the Court finds that a material dispute of

fact exists as to both prongs of the affirmative defense § 547(c)(2) that precludes a summary

judgment in Trustee's favor regarding the 90-Day Transfers.

### 2. The Insider Transfers to Goggin.

Trustee is not entitled to a judgment as a matter of law against Goggin under Count 18

for the $470,408.58 transferred to him within one year of the Petition Date via periodic payments

on the 2013 Amended Notes. Goggin does not dispute his insider status for purposes of

§ 547(b)(4)(B). But Goggin has demonstrated that genuine issues of material fact remain with

respect to U.S. Coal's solvency in the pertinent time period and with respect to the ordinary

course of business defense.

### D. Conclusion as to Count 18.

In sum, Goodwin's Motion as to the Insider Transfers in Count 18 is GRANTED, and

Trustee's Motion on Count 18 is DENIED.

### <u>CONCLUSION</u>

The foregoing constitutes the Court's findings of fact and conclusions of law in

accordance with Bankruptcy Rule 7052. By separate order, the Court will schedule a status

hearing in approximately 60 days to address the trial of the remaining issues herein.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Tracey N. Wise*
**Bankruptcy Judge**
**Dated: Wednesday, May 29, 2019**
**(tnw)**